2015 IL App (1st) 142622

FIFTH DIVISION
September 25, 2015

No. 1-14-2622

|                                                        |     |                    |
|--------------------------------------------------------|-----|--------------------|
|                                                        | )   | Appeal from the    |
| ATHINA DANIGELES,                                      | )   | Circuit Court of   |
|                                                        | )   | Cook County        |
|     Plaintiff-Appellant,           | )   |                    |
|                                                        | )   |                    |
| v.                                                     | )   | No. 14 CH 4430     |
|                                                        | )   |                    |
| THE ILLINOIS DEPARTMENT OF FINANCIAL                   | )   |                    |
| AND PROFESSIONAL REGULATION,                           | )   | Honorable          |
|                                                        | )   | Mary L. Mikva,     |
|     Defendant-Appellee.            | )   | Judge Presiding.   |

PRESIDING JUSTICE REYES delivered the judgment of the court, with opinion.
Justices Gordon and Palmer concurred in the judgment and opinion.

**OPINION**

¶ 1    Plaintiff Athina Danigeles[1] (Danigeles) appeals an order of the circuit court of Cook County denying her complaint for administrative review and affirming the decision of the Director of the Division of Professional Regulation (Director) of the Illinois Department of Financial and Professional Regulation (Department) to revoke her dental license for a minimum of five years and impose a $125,000 fine.  On appeal, Danigeles contends that the Director's determination must be reversed because:  (1) the Director's finding that the owner of a dental

---

[1] Danigeles' name is spelled "Athena" in her brief.  At the hearing before the Board, she spelled her name "Athina."  Accordingly, we will refer to her as "Athina."

practice is responsible for the billings generated from that practice was in error; (2) the Director improperly excluded mitigating evidence in the form of testimony from three of Danigeles' witnesses; and (3) the discipline she received was disproportionate to the alleged offenses. For the reasons that follow, we affirm.

¶ 2                                    BACKGROUND

¶ 3      Danigeles is a dentist who was licensed by the Department in 1987. On August 14, 2012, the Department filed an amended complaint consisting of 27 counts arising from Danigeles' treatment and billing of patient G.M. and his three minor children, M.M., K.M., and C.M. (collectively the M family).[2] Specifically, the amended complaint alleged in counts I, V, IX, XIII, XVII, and XXI that Danigeles violated section 23(9) of the Illinois Dental Practice Act (Act) (225 ILCS 25/23(9) (West 2012)) by obtaining or seeking to obtain practice, money, or any other things of value by false or fraudulent representation. Counts II, VI, X, XIV, XVIII, and XXII alleged Danigeles engaged in dishonorable, unethical, or unprofessional conduct of a character likely to deceive, defraud or harm the public under section 23(11) of the Act (225 ILCS 25/23(11) (West 2012)). Counts III, VII, XI, XV, XIX, and XXIII alleged she willfully made or filed false records or reports in her practice as a dentist in violation of section 23(22) of the Act (225 ILCS 25/23(22) (West 2012)). Counts XX, XXIV, XXV, XXVI, and XXVII alleged Danigeles engaged in professional incompetence as manifested by poor standards of care in violation of section 23(23) of the Act (225 ILCS 25/23(23) (West 2012)). Finally, counts IV, VIII, XII, and XVI alleged Danigeles engaged in repeated irregularities in billing for services rendered to a patient in violation of section 23(25) of the Act (225 ILCS 25/23(25) (West

---

[2] The original complaint is not included in the record on appeal.

2012)).[3] The Department sought the revocation or suspension of Danigeles' dental license and fines not exceeding $10,000 per violation.[4]

¶ 4                                    Administrative Hearing

¶ 5     Administrative law judge Sadzi M. Oliva (ALJ) conducted a hearing beginning November 13, 2012. The matter was continued for further hearing to November 14-15, 2012, and then to February 25, February 27, March 6, March 7, March 20, and April 3, 2013. At the time of the hearing, Danigeles' license was on probation pursuant to a consent order entered in 2009.

¶ 6     The Department called the following witnesses: (1) G.M.; (2) Danigeles, as an adverse witness; (3) Helen Spetly (Spetly), the Department's investigator; (4) Dr. John Kenney (Dr. Kenney), an expert witness and subsequent treater of M.M., K.M., and C.M.; and (5) Dr. Daniel Hogan (Dr. Hogan), an expert witness and subsequent treater of G.M. Danigeles called the following witnesses to testify at the hearing: (1) Dr. Hugo Bertagni (Dr. Bertagni), an expert witness; (2) James Hayes (Hayes), a handwriting expert; and (3) Spetly.

¶ 7                                         G.M.

¶ 8     G.M. testified to the following facts. He is employed as a plumber and has dental insurance through Delta Dental. His children, M.M., K.M., and C.M., are insured by Delta Dental as well as Sun Life (formerly known as Genworth Financial) through their mother. G.M.

---

[3] Ultimately, the Director determined the Department failed to meet its burden with respect to counts XXV and XXVI, that the treatment provided by Danigeles failed to meet the standard of care and counts III, VII, XI, XV, XIX, and XXIII, that she willfully made or filed false records. Accordingly, we will limit our discussion of the facts to the relevant counts at issue on appeal. We note, however, that the Director upheld counts XX, XXIV, and XXVII, which related to Danigeles' failure to properly chart the M family's restorations.

[4] The record indicates that Danigeles filed an amended answer and affirmative defenses. This answer, however, is not included in the record, but is referenced in the ALJ's recommended decision as well as the Director's decision.

and his children were patients of Danigeles' dental practice. He first became suspicious of Danigeles' billing practices in 2008 when he received statements that indicated that dental services were rendered on dates he knew no one in his family had received services at Danigeles' office. At the end of 2008, he terminated his and his children's dental care with Danigeles and began taking the children to Dr. Kenney.

¶ 9 On cross-examination, G.M. clarified that he first went to Danigeles' office in 2005 and was treated by her and two other dentists, "Dr. Mark and Dr. Kalkanis." G.M. also testified that all of M.M.'s dental treatment was performed by Danigeles. K.M. was primarily treated by Danigeles, but he was also treated by Dr. Kalkanis. His son, C.M., was initially treated by Danigeles, but was later treated by another dentist at Danigeles' office.

¶ 10 G.M. further testified on cross-examination that he questioned some of the insurance statements he received because the dates of service were inaccurate and the work performed was incorrect. In addition, he would receive bills that indicated three fillings had been provided, yet his children had only been in the treatment room a short period of time. G.M. provided the Department with the M family's treatment records from Danigeles' office. Those records were admitted into evidence.

¶ 11                                            Danigeles

¶ 12 Danigeles testified she has been a licensed dentist in the State of Illinois since 1987 and owns her own dental practice. She, however, declined to answer any further questions related to her care and billing of patients G.M., M.M., K.M., and C.M., asserting her fifth amendment right to be free from self-incrimination. Additionally, she declined to answer questions regarding her process of charting patient dental records, her insurance billing process, whether she was responsible for all of the billings of the practice, and whether she charged for services she did not

render.

¶ 13                                    Helen Spetly

¶ 14    Spetly testified she has been the lead investigator for the dental investigation unit of the

Department since 1994 and that she investigated G.M.'s complaint against Danigeles.  In

conducting her investigation, Spetly interviewed witnesses and obtained the M family's dental

and billing records from Danigeles' office.  She also received dental records from the M family's

subsequent treaters, Dr. Kenney and Dr. Hogan, as well as billing records from Delta Dental and

Sun Life/Genworth Financial.  These records were admitted into evidence during Spetly's

testimony.

¶ 15    On cross-examination, Spetly testified that she did not obtain a handwriting analysis on

the M family's treatment notes from Danigeles' office.  She further testified that she did not know

who made the handwritten entries in these treatment notes and declined to investigate who

authored them, as she found it to be irrelevant to her investigation into Danigeles' billing

practices.  She acknowledged, however, that other dentists worked at Danigeles' dental office and

that certain handwriting did appear to be different from the others on the charts.

¶ 16    On redirect, Spetly testified that Danigeles never filed a complaint with the Department

against any other dentist for falsifying records or billing in her dental office.

¶ 17                                    Dr. John Kenney

¶ 18    Dr. Kenney testified he graduated from Loyola University School of Dentistry in 1977

and received his specialty certificate in pediatric dentistry in 1979 along with a master of science

in oral biology.  He has owned his own practice since 1980, but has been practicing dentistry

since 1977.  Dr. Kenney was tendered as an expert witness by the Department without objection.

¶ 19    Dr. Kenney testified that in 2009, G.M. brought M.M., K.M., and C.M. to his office for

dental care. On March 24, 2009, Dr. Kenney performed an oral examination and also took radiographs and photographs of M.M.'s teeth. Dr. Kenney testified that on August 5, 2009, he prepared a letter in which he compared what he observed of M.M.'s dental work to Danigeles' treatment and billing records for M.M. In examining M.M., Dr. Kenney testified he discovered the following inconsistencies between his observations and Danigeles' treatment and billing records:

- Tooth A[5] had a two-surface composite restoration, but was billed to both insurance companies as a four-or-more surface composite restoration on May 8, 2008.

- Tooth B had a three-surface composite restoration, but was billed to both insurance companies as a four-or-more-surface composite restoration on May 8, 2008.

- Tooth I had a two-surface composite restoration and pulpotomy, but was billed to both insurance companies as a four-or-more-surface composite restoration and pulpotomy on May 8, 2008.

- Tooth J had a two-surface composite restoration, but was billed to Delta Dental as a four-or-more-surface composite restoration on May 8, 2008.

- Tooth K had a two-surface composite restoration, but was billed to both insurance companies as a four-or-more composite restoration on June 8, 2007.[6] Another bill was later submitted to both insurance companies that indicated tooth K was treated with a stainless steel crown and pulpotomy on May 23, 2008. Dr. Kenney found the enamel was untouched and had no crown.

---

[5] Baby teeth are characterized with letters A through T and adult teeth are characterized with numbers 1 through 32.

[6] Danigeles' treatment records indicate a date of service of May 18, 2007; however, the billing records indicate a date of service of June 8, 2007 for the same procedure.

- Tooth L had a two-surface composite restoration and pulpotomy, but was billed to both insurance companies as a four-or-more-surface composite restoration on May 18, 2007. Another bill was submitted to Delta Dental for a stainless steel crown and pulpotomy on May 23, 2008. Genworth Financial was billed for a stainless steel crown on May 23, 2008. Dr. Kenney, however, found no stainless steel crown on the tooth.

- Tooth S had a two-surface composite restoration, but was billed as a four-or-more-surface composite restoration on June 8, 2007. Tooth S was also billed for a stainless steel crown and a pulpotomy on June 10, 2008; however, no crown and no pulpotomy were present.

- Tooth T had a two-surface composite restoration, but was billed to both insurance companies as a three-surface composite restoration on June 8, 2007. The following year, Delta Dental was billed for a four-or-more-surface composite restoration on June 10, 2008.

¶ 20    In addition, Dr. Kenney testified that Danigeles' treatment records indicated that on August 19, 2008, M.M. had one-surface composite restorations performed on teeth 7, 8, 9, and 10 which were billed to Delta Dental. Dr. Kenney testified, however, that these teeth were not erupted at the time of his examination. Dr. Kenney further testified that M.M. had no restorations present on teeth 23, 24, 25, and 26, despite Delta Dental being billed for a three-surface restoration for each tooth on August 19, 2008. Dr. Kenney opined that based on their state of eruption, it would be impossible for teeth 23, 24, 25, and 26 to have been present and restored in August of 2008.

¶ 21    Overall, Dr. Kenney found that in relation to M.M.'s dental treatment, Danigeles' charging and billing did not properly document the procedures she provided. He also opined that

billing for treatment done on teeth that have not yet erupted falls below the minimum standards of the profession. According to Dr. Kenney, a clerical error in M.M.'s chart was not a reasonable assumption:

> "Bad record keeping, billing for work that's not done. Mistakes can be made, certainly, but when you see it to the level, as I said, in this particular case, it was totally beyond what I could even imagine."

Dr. Kenney testified that he had never observed malpractice and fraud that reaches the level of this case.[7]

¶ 22    Dr. Kenney next testified that on April 12, 2009, he performed an oral examination of K.M. He also took photographs and radiographs of K.M. and reviewed Danigeles' prior treatment records. Dr. Kenney testified that on August 5, 2009, he prepared a letter in which he compared his observations of K.M.'s dental work to Danigeles' billing records for treatment of K.M. In examining K.M., Dr. Kenney testified he discovered the following inconsistencies:

> - Tooth A had a two-surface composite restoration, but was billed to Delta Dental as a four-or-more-surface composite restoration on August 19, 2008.

> - Tooth K had a two-surface composite restoration, but was billed to Delta Dental as a four-or-more-surface composite restoration on August 19, 2008.

> - Tooth T had a two-surface composite restoration, but was billed to both insurance companies as a four-or-more-surface composite restoration on January 25, 2008.

> - Tooth 3 had a two-surface composite restoration, but was billed to Delta Dental

---

[7] Dr. Kenney also testified regarding the standard of care Danigeles provided M.M., K.M., and C.M. As the Director determined that the Department did not meet its burden of proof regarding whether Danigeles provided substandard care to the M family, we need not include Dr. Kenney's testimony regarding this point.

as a three-surface composite restoration on July 22, 2008.

- Tooth 14 had a two-surface composite restoration, but was billed to both insurance companies as a three-surface composite restoration on June 10, 2008.

- Tooth 19 had a one-surface composite restoration, but was billed to both insurance companies as a three-surface composite restoration on June 10, 2008.

- Tooth 30 had a one-surface composite restoration, but was billed to Delta Dental as a three-surface composite restoration on January 25, 2008.

- Teeth 23, 24, 25, and 26 were virgin, not restored teeth; however, Delta Dental was billed for each tooth as a three-surface composite restoration on August 19, 2008.

¶ 23    Dr. Kenney testified as follows regarding C.M.'s dental treatment.  On April 6, 2009, he performed an oral examination of C.M.  He also took radiographs and photographs of C.M.  Dr. Kenney then compared his examination of C.M. to Danigeles' treatment and billing records.  He discovered the following inconsistencies:

- Tooth 2 had a one-surface composite restoration, but was billed to both insurance companies as a three-surface composite restoration on June 10, 2008. Dr. Kenny found no entry in Danigeles' treatment records for this restoration.

- Tooth 3 had a two-surface composite restoration, but was billed to both insurance companies as a three-surface composite restoration on June 10, 2008.

- Tooth 15 had a one-surface composite restoration, but was billed to both insurance companies as a three-surface composite restoration on July 22, 2008.

- Tooth 18 had a one-surface composite restoration, but was billed to both insurance companies as a three-surface composite restoration on January 25, 2008.

- Tooth 19 had a three-surface composite restoration, but was billed to both

9

insurance companies as a four-or-more-surface composite restoration on January 25, 2008.

    - Tooth 30 had a one-surface composite restoration, but was billed to both insurance companies as a three-surface composite restoration on July 22, 2008.

    - Tooth 31 had a one-surface composite restoration, but was billed to both insurance companies as a three-surface composite restoration on July 22, 2008.

¶ 24    Dr. Kenney also testified regarding insurance billing practices. Dr. Kenney explained that billing two insurance companies as primaries is incorrect and, if done knowingly, is fraud. Dr. Kenney also opined that charting and billing for services not rendered falls below the minimum standards of the profession.

¶ 25    On cross-examination, Dr. Kenney testified that reasonable dental practitioners can vary in their opinion as to where the lines between certain surfaces of the tooth exist; however, this would not apply in the billing context, but rather is a "clinical assessment of a tooth based on its anatomic considerations."

¶ 26    Regarding responsibility for dental records, Dr. Kenney testified that it is the treating dentist who is ultimately responsible for the entry made by his or her staff. He further testified that although an associate dentist is responsible for the accuracy of their entry, the dentist who owns the practice is ultimately responsible. Dr. Kenney also checks to make sure the work performed in his office is consistent with what is submitted to the insurance company at the end of each day. He does not cross-reference the work performed by his associate dentists, but he relies on the integrity of the person he hires to accurately report their work.

¶ 27    Lastly, Dr. Kenney testified he wrote the August 5, 2009, letter of his own volition because, in his 32 years of practicing dentistry, he had never observed this amount of inadequate

dentistry and insurance billing as he observed in the case of the M family.

¶ 28   On redirect examination, Dr. Kenney testified that certain Delta Dental and Sun Life /Genworth Financial insurance claim forms indicated that the children of the M family did not have secondary insurance coverage.

¶ 29                                    Dr. Daniel Hogan

¶ 30   Dr. Hogan testified he is a doctor of dental medicine and has been practicing dentistry for 33 years.  He has operated his own dental practice since 1982, which is currently located in Park Ridge, Illinois.  Prior to owning his own dental practice, Dr. Hogan was an associate dentist for two years.

¶ 31   Dr. Hogan testified that G.M. first came to him as a patient on March 30, 2009.  During G.M.'s initial visit, Dr. Hogan took a complete series of radiographs and conducted a comprehensive oral examination.  During G.M.'s examination, Dr. Hogan found an existing one-surface composite restoration on tooth 9.  Dr. Hogan testified this finding was directly in contradiction of Danigeles' charting for tooth 9, which indicated a four-surface composite restoration was previously performed on that tooth in 2005, a one-surface restoration in 2006, and a four-surface restoration in 2008.  In addition, the radiographs of G.M. taken in May of 2008 at Danigeles' office did not indicate tooth 9 had been restored.  Dr. Hogan testified that if a restoration had at one time been present and had since fallen out, an outline of where the filling had been would be apparent.  Additionally, there may be recurrent decay and the sides of the tooth may be brown or stained.  He testified that in this case, the enamel and the facial and lingual surfaces of tooth 9 were solid and intact, with no mechanical holes or openings.

¶ 32   There was, however, decay present on tooth 9.  As a result, Dr. Hogan restored five surfaces on tooth 9.  Dr. Hogan submitted this claim to Delta Dental, which refused to cover the

restorations on tooth 9 on the basis that restorations on the same tooth number and surface could be claimed only once in a 12-month period. Dr. Hogan then submitted a letter explaining his restoration of tooth 9 to Delta Dental along with copies of G.M.'s radiograph. Based on this letter Delta Dental reversed its initial denial of payment.

¶ 33    Dr. Hogan also testified that a patient's dental chart is the physical property of the dental practice. From time to time a dental associate or dental hygienist will make notations in a patient's chart but ultimately the owner of the dental practice is responsible for the contents of the chart.

¶ 34    On cross-examination, Dr. Hogan testified that he has 33 years of experience in dental billing and that he is the one who is ultimately responsible for the billings submitted in his name. Dr. Hogan also explained that when a patient has two insurers the primary insurance is billed first. If an outstanding balance remains, a claim form is submitted to the secondary insurance along with a copy of the explanation of benefits from the primary insurance. This is so that the secondary insurance knows what the primary insurance has covered and any responsibility the secondary insurance may have. Dr. Hogan testified he does not bill insurers simultaneously.

¶ 35                                Dr. Hugo Bertagni

¶ 36    Danigeles offered the testimony of Dr. Bertagni in rebuttal to the Department's claims that she improperly billed M.M. and K.M. Danigeles' position was that Marc and Marisol K., two individuals with initials similar to M.M. and K.M., were present in her office on August 19, 2008, and had restorations performed that corresponded to the restorations charted that same day for patients M.M. and K.M. Essentially, Danigeles' theory of the case was that this was a "simple clerical error" involving a "chart mix-up." Despite objections from the Department, the ALJ allowed Dr. Bertagni to testify regarding his examination of Marc and Marisol K. and their

pertinent dental records. Dr. Bertagni provided the following testimony.

¶ 37    Dr. Bertagni testified he received a degree of doctor of dental surgery from Loyola Dental School in 1965 and commenced his own practice in 1973. Dr. Bertagni's curriculum vitae was admitted into evidence and he was qualified as an expert in general dentistry based on his experience.

¶ 38    On March 2, 2013, Dr. Bertagni performed independent oral examinations on two of Danigeles' patients, Marc[8] and Marisol K. (who were not named in the Department's amended complaint) at Danigeles' behest in order to chart their existing dental restorations. Dr. Bertagni found Marc K. had three-surface restorations on teeth 23, 24, and 25 and a two-surface restoration on tooth 26. As to the work performed on Marisol K., Dr. Bertagni found three-surface restorations on teeth 23, 24, and 25 and a one-surface restoration on tooth 26.

¶ 39    After examining Marc and Marisol K., Dr. Bertagni compared his findings to Danigeles' treatment records. He did not observe any restorations on teeth 23, 24, 25, or 26 recorded in Marc K.'s records nor did he observe any restorations on teeth 23, 24, 25, or 26 recorded in Marisol K.'s records. With the exception of these omissions, Dr. Bertagni testified that his independent oral examinations of Marc and Marisol K. revealed that their restorations were substantially the same as what Danigeles had charted in her treatment records.

¶ 40    On cross-examination, however, Dr. Bertagni testified he did not compare the findings of his examinations of Marc and Marisol K. to Danigeles' treatment records. Dr. Bertagni also testified that he is the owner of his dental practice and that as the owner of a dental practice, he is responsible for the actions of his employees and the billings generated from his office. He

---

[8] The record indicates that Marc K.'s name is also spelled "Mark," but in many places his name was redacted due to privacy considerations. Accordingly, we do not know the proper spelling of Marc's name; however, we will refer to him as "Marc" as that was how it was spelled in the Director's determination.

further testified that he employs two individuals to do the billing at his practice and they utilize his electronic signature when submitting claims. Dr. Bertagni testified that he would report any unauthorized use of his signature if he knew it was happening. Regarding billing patients with two insurance carriers, Dr. Bertagni testified that he bills the primary and secondary insurance companies separately. Dr. Bertagni also clarified that he did not clinically examine G.M., M.M., K.M., or C.M. nor did he review any of their treatment or billing records prior to the hearing.

¶ 41    On redirect Dr. Bertagni clarified that he reviewed Danigeles' treatment records of Marc and Marisol K. subsequent to his examination of them.

¶ 42                                James Hayes

¶ 43    James Hayes, a forensic document examiner, testified that he entered the field of forensic document examination in 1975 when he was a Chicago police officer. He has been board certified by the American Board of Forensic Document Examiners since 1985. His curriculum vitae was admitted into evidence and Hayes was qualified as an expert in handwriting analysis.

¶ 44    Hayes testified that he obtained handwriting exemplars from Danigeles at her office on three different occasions: February 12, 15, and 18, 2013. He then examined photocopies of M.M., K.M., and C.M.'s dental records and compared them with Danigeles' handwriting exemplars. Hayes opined that it is unlikely the questioned entries in these treatment records were made by Danigeles. Hayes, however, did not prepare a formal report with his findings.

¶ 45    On cross-examination, Hayes acknowledged that many factors may affect a person's handwriting such as age, fatigue, arthritis, caffeine intake, nicotine withdrawal, illness or injury, medications, stress, height at which the person writes, or wearing latex gloves. He further opined that photocopies alter the characteristics of a person's handwriting and he would have preferred to examine the original dental records instead of the photocopies he was provided. In

14

addition, Hayes testified that it would have been beneficial to have an exemplar that was made contemporaneously with the dental records.

¶ 46                                                Helen Spetly

¶ 47    Danigeles re-called Spetly who testified that she met with Dr. Kalkanis, an associate dentist at Danigeles' practice, on February 1, 2010, as part of a different investigation into whether Danigeles had violated her probation in October of 2009.  During that conversation, Dr. Kalkanis agreed she would send a fax to Spetly's office regarding her recollection of the patients she treated in October 2009 while working at Danigeles' office.  According to Spetly, on February 2, 2010, she received a fax of handwritten notes that she believed to be from Dr. Kalkanis.  The fax was admitted into evidence over the Department's objection as mitigating evidence that entries in the treatment records may have been made by someone other than Danigeles.

¶ 48                                                Evidence

¶ 49    The following evidence pertinent to this appeal was admitted into evidence:
(1) Danigeles' treatment and billing records for G.M., M.M., K.M., and C.M.; (2) subsequent treatment records for G.M., M.M., K.M., and C.M.; (3) Dr. Kenney's letters regarding M.M., K.M., and C.M.; (4) affidavits from Delta Dental and Sun Life attesting to the veracity of the insurance billing statements; (5) Danigeles' prior disciplinary orders; (6) Dr. Bertagni's treatment records of Marc and Marisol K.; (7) Danigeles' treatment records of Marc and Marisol K.; and (8) Danigeles' handwriting exemplars.

¶ 50    The prior disciplinary orders indicated that Danigeles had been disciplined by consent on three previous occasions.  In 1994, she received a 45-day suspension, two-year probation, and a $12,500 fine for allegations she engaged in insurance irregularities by submitting claims seeking

payment for services she did not render, receiving payments for services she did not render, and making misrepresentations to the insurance company. Specifically, the Department alleged that Danigeles, "submitted insurance claim forms for services purportedly provided by her; communicated with an insurance company representing herself to be her former employer (a dentist) and made misrepresentations to the insurance company with respect to the provider of services and the nature of the services claimed" in violation of sections 23(9), 23(11), and 23(25) of the Act (225 ILCS 25/23(9), (11), (25) (West 1994)). In 2001, she received a reprimand and a $5,000 fine for failing to maintain proper dental records. In 2009, she received a one-month suspension, a four-year probation, and a $35,000 fine for allegations she engaged in unlawful conduct in violation of the Act, including: "[o]btaining or seeking to obtain practice, money, or any other things of value by false or fraudulent representations" (225 ILCS 25/23(9) (West 2008)); "[e]ngaging in dishonorable, unethical, or unprofessional conduct of a character likely to deceive, defraud, or harm the public" (225 ILCS 25/23(11) (West 2008)); "[a] violation of any provision of this Act or any rules promulgated under this Act" (225 ILCS 25/23(15) (West 2008)); and "[r]epeated irregularities in billing a third party for services rendered to a patient: Reporting charges for services not rendered" (225 ILCS 25/23(25)(b) (West 2008)).

¶ 51                                    ALJ's Recommendation

¶ 52     On May 16, 2013, the ALJ issued a recommended decision. The ALJ recounted the procedural history, the allegations and evidence presented, made findings of fact, and discussed the relevant law. The ALJ determined that the Department proved by clear and convincing evidence that Danigeles violated the Act by obtaining or seeking to obtain practice, money, or any other things of value by false or fraudulent representation, as alleged in counts I, V, IX, XIII, XVII, and XXI; engaging in dishonorable, unethical or unprofessional conduct of a character

16

likely to deceive, defraud or harm the public as alleged in counts II, VI, X, XIV, XVIII, and XXII; engaging in professional incompetence as manifested by poor standards of care, as alleged in counts XX, XXIV, XXV, XXVI, and XXVII; and gross or repeated irregularities in billing for services rendered to a patient, as alleged in counts IV, VIII, XII, and XVI. The ALJ found no violation of section 23(22) of the Act (225 ILCS 25/23(22) (West 2012)), as alleged in the Department's complaint for "[w]illfully making or filing false records or reports in his or her practice as a dentist." The ALJ recommended revocation of Danigeles' dental license and that she be fined $75,000.

¶ 53    Throughout the recommendation, the ALJ noted that Danigeles made various admissions in her answer to the Department's amended complaint. Among them was the admission that she or an associate provided dental services to G.M., M.M., K.M., and C.M. Danigeles also admitted that a bill for a three-surface restoration on G.M.'s tooth 9 was generated through her office. Danigeles further admitted that on August 19, 2008, she charted three-surface restorations on teeth 23, 24, 25, and 26 and one-surface restorations on teeth 7, 8, 9, and 10 of M.M. In addition, Danigeles admitted to charting and performing a four-surface restoration on K.M.'s teeth A and K on August 19, 2008. She also charted three-surface restorations on teeth 23, 24, 25 and 26 of K.M. on August 19, 2008.

¶ 54    Based on the testimony of expert witnesses, Dr. Kenney, Dr. Hogan, and Dr. Bertagni, the ALJ found that Danigeles, as the owner of the dental practice, was ultimately responsible for all charting and billing done within the practice even if done by the associates or staff.

¶ 55    The ALJ found Dr. Kenney's and Dr. Hogan's testimonies to be credible and accepted Dr. Kenney's assessment of the restorations the M family children actually received. The ALJ, however, found Dr. Bertagni's testimony to be relevant only in regards to Danigeles' defense that

she erroneously charted the treatments performed on Marc and Marisol K. in M.M.'s and K.M.'s charts. The ALJ stated that she found "[Danigeles'] defense highly implausible and, as such, not credible. This Administrative Tribunal observes that the charting does not match up as a seamless switch in patient charts as [Danigeles] argues."

¶ 56    Next, the ALJ determined that without the testimony of Dr. Kalkanis or an appropriate affidavit, she could not make a finding that the handwritten notes faxed to Spetly were written or sent by Dr. Kalkanis.

¶ 57    The ALJ also assessed little weight to Hayes' opinions and stated:

> "[E]ven if Mr. Hayes' preliminary findings are correct and it is unlikely that [Danigeles] made the questioned entries, previous testimony from [Dr. Bertagni], [Dr. Kenney] and Dr. Hogan support the premise that [Danigeles], as owner of the dental practice, was responsible for all charting and billing generated in her practice. Whether the writing was made by someone other than [Danigeles] may be applicable to mitigation, whether the fraudulent billing was intentional, but does not relieve [Danigeles] of all liability related to charting and billing errors in her practice."

¶ 58    In recommending that Danigeles' license be revoked and she be fined $75,000, the ALJ stated that she took into consideration the fact that Danigeles had previously been disciplined by the Department for similar conduct including a previous reprimand, current probation, and fines of $5,000, $12,500, and $35,000.

¶ 59                              The Board's Decision

¶ 60    The Illinois Board of Dentistry (Board) adopted in part and rejected in part the ALJ's recommendation. The Board adopted the ALJ's findings of fact and conclusions of law; however, it recommended Danigeles not be able to petition for reinstatement of her license for a

minimum period of five years. In addition, the Board recommended the fine be increased to $125,000 to be paid within 60 days of imposition.

¶ 61                                    The Director's Determination

¶ 62     Thereafter, Danigeles filed a motion for rehearing, which was fully briefed and presented to the Director. On February 28, 2014, the Director adopted the recommendations of the ALJ and the Board in part and denied Danigeles' motion for rehearing. The Director rejected the ALJ's findings that the treatment provided by Danigeles failed to meet the standard of care as the Department failed to meet its burden of proving by clear and convincing evidence that Danigeles acted as alleged in counts XXV and XXVI in violation of section 23(23) of the Act (225 ILCS 25/23(23) (West 2012)).

¶ 63     The Director, however, specifically affirmed the ALJ's and Board's findings regarding all the other counts of the amended complaint. The Director expressly stated that he was not persuaded by Danigeles' argument that she should not be held responsible for the acts of her assistant dentists. The Director pointed out that Danigeles was "subject to discipline not due to her employees' *treatment of patients* who failed to meet the profession's standard of care, but for *her own* dental office's *billing practices*." (Emphasis in original.) The Director found, "the owner of a dental practice is ultimately responsible for the charting and billing submitted by the practice" and "[i]t is undisputed that both the treatment notes and the billing records were generated by Respondent's dental office."

¶ 64     In addition, the Director found Spetly's and Hayes' testimonies regarding the authorship of the treatment notes to be irrelevant to the billing allegations. Specifically, he found the "authorship of the treatment notes for patients G.M., M.M., C.M., and K.M. does not bear on whether or not the treatment notes were used by [Danigeles'] dental office for billing purposes, a

19

fact that is undisputed." The Director did not consider Dr. Bertagni's testimony regarding Marc and Marisol K., finding it was irrelevant due to the fact the Department's complaint contained no allegations with respect to them. The Director further found that "the hours of [Dr. Bertagni's] testimony regarding work performed on Marc and Marisol K. are superfluous because the record clearly shows that M.M. was billed for services not rendered to her."

¶ 65    Finally, the Director adopted the Board's recommendation for discipline based on a variety of factors, including: "(1) the seriousness of the offenses, (2) the presence of multiple offenses, (3) [Danigeles'] prior disciplinary history, (4) the impact of offenses on the injured parties, (5) [Danigeles'] lack of contrition for the offenses, and (6) financial gain to [Danigeles] as a result of committing the offenses."

¶ 66                          Complaint for Administrative Review

¶ 67    On March 14, 2014, Danigeles filed a complaint for administrative review with the circuit court of Cook County. On July 23, 2014, after the matter was fully briefed and argued, the circuit court affirmed the Director's decision. Danigeles now appeals from the order of the circuit court.

¶ 68                                    ANALYSIS

¶ 69    Final administrative decisions made by the Department of Financial and Professional Regulation pursuant to the Act are subject to judicial review under the provisions of the Administrative Review Law. 225 ILCS 25/32 (West 2012); 735 ILCS 5/3-101 *et seq.* (West 2012). The Administrative Review Law provides that this court may review "all questions of law and fact presented by the entire record," but may not consider new or additional evidence in making its determination. 735 ILCS 5/3-110 (West 2012). In reviewing a final administrative decision, we review the Director's decision and not the ALJ's or the circuit court's determination.

20

*Parikh v. Division of Professional Regulation of the Department of Financial & Professional Regulation*, 2014 IL App (1st) 123319, ¶ 19. The standard of review depends on the question presented; this court reviews factual questions under the manifest weight of the evidence standard, questions of law *de novo*, and mixed questions of law and fact under the clearly erroneous standard. *Heabler v. Illinois Department of Financial & Professional Regulation*, 2013 IL App (1st) 111968, ¶ 17; *Kafin v. Division of Professional Regulation of the Department of Financial & Professional Regulation*, 2012 IL App (1st) 111875, ¶ 31.

¶ 70     Danigeles raises numerous claims on appeal. First, Danigeles challenges the Director's finding that the owner of a dental practice is responsible for the billings generated from that practice. Second, Danigeles contends that the Director improperly excluded mitigating evidence derived from the testimonies of Dr. Bertagni, Hayes, and Spetly. Last, Danigeles maintains the discipline she received was disproportionate to the alleged offenses.

¶ 71     Prior to addressing the substance of Danigeles' appeal, we note that she makes numerous additional arguments that essentially call for us to reweigh the evidence or assess the credibility of the witnesses. Such arguments include: (1) the Department failed to present evidence that she violated the Act; (2) the Department did not investigate who performed the dental services and authored the treatment notes; (3) the testimony of Dr. Kenney was insufficient because reasonable dentists can differ on their opinions as to what restorations were performed; and (4) Dr. Kenney's testimony should have been discredited because he did not know who treated M.M., K.M., or C.M. or who authored their treatment notes.

¶ 72     It "is for the Director, as the trier of fact, to evaluate all evidence, judge the credibility of witnesses, resolve any conflicts in the evidence, and draw reasonable inferences and conclusions from the facts." *Anderson v. Department of Professional Regulation*, 348 Ill. App. 3d 554, 561

(2004). "The Director may accept or reject as much or as little of a witness's testimony as he pleases." *Morgan v. Department of Financial & Professional Regulation*, 388 Ill. App. 3d 633, 658 (2009). It is not the function of this court to " 'reevaulate witness credibility or resolve conflicting evidence,' but rather to determine only 'whether the findings of fact are supported by the manifest weight of the evidence.' " *Id.* (quoting *Ulysse v. Lumpkin*, 335 Ill. App. 3d 886, 893 (2002)). Accordingly, based on the record, we find the Director's findings were not against the manifest weight of the evidence.

¶ 73    As a threshold matter, we note that Danigeles has failed to argue why any of the issues she raises would constitute reversible error, particularly where the evidence thoroughly supports the Director's ultimate determination. We review the Director's decision on the legal effect of a given set of facts under the clearly erroneous standard. *Parikh*, 2014 IL App (1st) 123319, ¶ 30. The Director's decision will be deemed clearly erroneous "only where, upon review of the entire record, we are 'left with the definite and firm conviction that a mistake has been committed.' " *Id.* (quoting *AFM Messenger Service, Inc. v. Department of Employment Security*, 198 Ill. 2d 380, 393 (2001)).

¶ 74    Here, the evidence, along with Danigeles' admissions, demonstrated that Danigeles violated the Act as alleged in the Department's amended complaint. See 225 ILCS 25/23(9), (11), (23), (25) (West 2012). Notably, Danigeles does not challenge the Director's finding that "[i]t is undisputed that both the treatment notes and billing records were generated by [Danigeles'] dental office." In fact, Danigeles admitted that certain bills were generated from her office and that she made certain restorations to the teeth of members of the M family. The billing statements were admitted into evidence and demonstrated that they were from "Athina J. Danigeles D.D.S." and electronically signed. In addition, correspondence from the insurance

companies identified the billing dentist as "Athina J. Danigeles." The evidence further demonstrated that many of the insurance claim forms indicated that the patients had no secondary insurance, when that plainly was not the case. This billing irregularity cannot be attributable to an associate dentist incorrectly making a notation in a patient's chart. When the bills are compared with Dr. Kenney's and Dr. Hogan's assessments of the extent of the M family's restorations, we cannot say that the Director's determination that Danigeles violated the Act was clearly erroneous.

¶ 75                                    The Director's Finding

¶ 76    Despite the overwhelming evidence that she submitted the billings in question, Danigeles argues that the Director's factual finding that "the owner of a dental practice is ultimately responsible for the charting and billing submitted by the practice" was in error. Specifically, Danigeles argues that there is no authority in the Act that allows the Department to discipline the owner of a dental practice for the actions of another licensed dentist. She asserts that this finding was improperly supported by the legal conclusions of Dr. Kenney and Dr. Hogan when they testified that the owner of a dental practice is responsible for the billings generated from the practice.

¶ 77    Findings of fact on review are held to be *prima facie* true and correct and should not be overturned unless they are against the manifest weight of the evidence. *Parikh*, 2014 IL App (1st) 123319, ¶ 28. "An administrative agency's factual determinations are against the manifest weight of the evidence if the opposite conclusion is clearly evident." *Id.*

¶ 78    In addition, administrative agencies may establish standards of conduct for applying statutes by either rulemaking or adjudication. *Maun v. Department of Professional Regulation*, 299 Ill. App. 3d 388, 401 (1998); *Homeward Bound Services, Inc. v. Department of Insurance*,

365 Ill. App. 3d 267, 273 (2006); *Heabler*, 2013 IL App (1st) 111968, ¶ 19. "Specific standards are desirable but not required to justify an agency's finding of a violation of statutory provisions [citations], even where the question may be one of first impression in an adjudicative context [citation] and, where appropriate, an agency may announce new principles or policies without resorting to formal rulemaking [citation]." *Boffa v. Department of Public Aid*, 168 Ill. App. 3d 139, 146 (1988). The choice lies within the agency's informed discretion. *Id.* at 145-46. "Moreover, administrative agencies are to be given wide latitude in determining what actions are reasonably necessary, and a court may not overturn an agency policy or action simply because the court considers the policy unwise or inappropriate." *Gersch v. Department of Professional Regulation*, 308 Ill. App. 3d 649, 658 (1999).

¶ 79    The sections of the Act Danigeles was found to have violated provide in pertinent part:

"The Department may *** revoke *** or take other disciplinary action as the Department may deem proper, including fines not to exceed $10,000 per violation, with regard to any license for any one or any combination of the following causes:

* * *

9. Obtaining or seeking to obtain practice, money, or any other things of value by false or fraudulent representations, but not limited to, engaging in such fraudulent practice to defraud the medical assistance program of the Department of Healthcare and Family Services (formerly Department of Public Aid).

***

11. Engaging in dishonorable, unethical, or unprofessional conduct of a character likely to deceive, defraud, or harm the public.

* * *

23. Professional incompetence as manifested by poor standards of care.

\*\*\*

25. Repeated irregularities in billing for services rendered to a patient. For purposes of this paragraph 25, 'irregularities in billing' shall include:

(a) Reporting excessive charges for the purpose of obtaining a total payment in excess of that usually received by the dentist for services rendered.

(b) Reporting charges for services not rendered.

(c) Incorrectly reporting services rendered for the purpose of obtaining payment not earned." Pub. Act 97-0813, § 395 (eff. July 13, 2012) (amending 225 ILCS 25/23 (West 2010)).

¶ 80    In arguing that the Act does not authorize her to be disciplined for the actions of another dentist, Danigeles relies on the out-of-state case *James v. Board of Dental Examiners*, 218 Cal. Rptr. 710 (Cal. Ct. App. 1985). As correctly noted by the Director, *James* holds no precedential value in Illinois. See *Skipper Marine Electronics, Inc. v. United Parcel Service, Inc.*, 210 Ill. App. 3d 231, 239 (1991) (noting that this court is not bound to follow decisions by federal courts other than the United States Supreme Court or by courts of any state other than Illinois). Moreover, *James* is distinguishable from the case at bar. The issue in *James* was whether the plaintiff's dental license could be revoked under the pertinent California law for the substandard treatment provided by an associate dentist where the plaintiff did not treat the patient. *James*, 218 Cal. Rptr. At 719. Here, the revocation of Danigeles' license was predicated on her office's poor record keeping and irregular billing practices.

¶ 81    Although the Act does not expressly set forth the responsibilities of owners of dental practices, in finding that Danigeles, as the owner of a dental practice, is responsible for the

billings submitted by that practice, we conclude that the Director was making policy for the Department. See *Heabler*, 2013 IL App (1st) 111968, ¶ 19. It is not for this court to overturn an agency policy or action simply because the court considers the policy unwise or inappropriate, particularly where the record demonstrates it was supported by the consistent testimonies of Dr. Kenney, Dr. Hogan, and Dr. Bertagni. See *Gersch*, 308 Ill. App. 3d at 658.

¶ 82     Danigeles, however, argues that Dr. Kenney and Dr. Hogan testified to legal conclusions and, therefore, this portion of their testimonies should have been excluded. "An administrative decision will not be overturned because the administrative judge failed to observe the rules of evidence unless the error 'materially affected the rights of any party and resulted in substantial injustice to [the party].' " *Kafin*, 2012 IL App (1st) 111875, ¶ 38 (quoting 735 ILCS 5/3-111(b) (West 2008) and *Matos v. Cook County Sheriff's Merit Board*, 401 Ill. App. 3d 536, 541 (2010)). An evidentiary ruling, even if incorrect, will not be reversed unless there is "demonstrable prejudice to the complaining party." *Matos*, 401 Ill. App. 3d at 541; see *Kafin*, 2012 IL App (1st) 111875, ¶ 38. We review an administrative agency's decision regarding the admission of evidence for an abuse of discretion. *Matos*, 401 Ill. App. 3d at 541.

¶ 83     We find *Heabler* to be instructive. In *Heabler*, the plaintiff, a licensed private detective and private security contractor, had an altercation with two police officers during a traffic stop. *Heabler*, 2013 IL App (1st) 111968, ¶ 3. As a result, the complaint against him alleged that his "explosive behavior, excessive use of unsecure weapons, misrepresentation to the police regarding the quantity of weapons he had and his proffered reason for having those weapons constituted unethical, unprofessional and dishonorable conduct warranting discipline" under section 40-10(a)(3) of the Private Detective, Private Alarm, Private Security, Fingerprint Vendor, and Locksmith Act of 2004 (225 ILCS 447/40-10(a)(3) (West 2008)). *Heabler*, 2013 IL App

(1st) 111968, ¶ 3. At the plaintiff's hearing, the Department presented Harry Brown as "an expert private detective" who was "familiar with industry standards regarding a private detective's conduct in a traffic stop." *Id.* ¶ 10. Brown testified that when an investigator is confronted by law enforcement, the investigator is to immediately identify himself as a private detective and notify the officer if the investigator is carrying a firearm. *Id.* Brown testified that the failure to do so would be unethical and unprofessional. *Id.* Based in part on this testimony, the Director found the plaintiff engaged in dishonorable, unethical or unprofessional conduct. *Id.* ¶¶ 14-15.

¶ 84    On appeal, the plaintiff argued that the Director's decision was not supported by the evidence because Brown testified to his personal opinion regarding the plaintiff's conduct rather than providing an opinion based on industry standards. *Id.* ¶ 17. We found the evidence was sufficient to support the Director's finding. *Id.* ¶ 19. Specifically, we concluded that "the Department reasonably could have found that Brown provided expert testimony based on industry standards that [the plaintiff] engaged in dishonorable, unprofessional or unethical conduct." *Id.* ¶ 21. In so finding, we noted that "not all policies of an agency must be announced in published rules [citation] and administrative agencies may establish standards of conduct through adjudication [citation]." *Id.* ¶ 19 (citing *Homeward Bound Services, Inc. v. Department of Insurance*, 365 Ill. App. 3d 267, 273 (2006), and *Maun v. Department of Professional Regulation*, 299 Ill. App. 3d 388, 401 (1998)). In addition, we acknowledged that the plaintiff "had ample opportunity to cross-examine Brown's expert testimony." *Id.* ¶ 21.

¶ 85    Similarly here, when considering Dr. Kenney's and Dr. Hogan's testimonies as a whole, the Department reasonably could have found that they provided expert testimony based on industry standards that Danigeles, as the owner of a dental practice, was responsible for the

billings generated from her office. In addition, Danigeles had the opportunity to cross-examine Dr. Kenney and Dr. Hogan regarding their billing practices. Danigeles' own expert, Dr. Bertagni, testified that he too was responsible as the owner of his dental practice for the billings generated from his office. This is not a situation where the experts were directly asked for their opinion as to whether Danigeles violated the Act. See *Kafin*, 2012 IL App (1st) 111875, ¶¶ 37-40. Moreover, even if this testimony did constitute an improper legal conclusion, Danigeles has not demonstrated she was prejudiced by its admission where there is ample evidence that she violated the Act. See *id.* ¶¶ 39-40 (concluding that the ALJ did not consider the legal conclusions in the expert witness's testimony when making his determination and that, even if he had, the error did not prejudice the plaintiff due to the overwhelming evidence presented against him).

¶ 86    In support of her argument that experts may not testify with respect to legal conclusions, Danigeles relies solely on *LID Associates v. Dolan*, 324 Ill. App. 3d 1047 (2001). That case, however, is distinguishable as it involved a civil jury trial wherein the plaintiffs alleged the defendants breached their fiduciary duties. *Id.* at 1050. There, two of the plaintiffs' expert witnesses misstated the law regarding fiduciary duties in direct contradiction of the jury instructions. *Id.* at 1059. The plaintiffs' counsel also "emphasized this 'expert' testimony throughout the trial, including opening statements and closing argument" and offered no other proof that the transactions were unfair. *Id.* The reviewing court found the trial court abused its discretion in allowing this testimony and found the prejudicial effect required the jury verdict be set aside. *Id.* at 1059-60. As the case at bar is neither a civil matter nor a jury trial, we decline to find *LID Associates* relevant to the matter at hand. Accordingly, we conclude the Director did not abuse his discretion when he allowed the testimonies of Dr. Kenney and Dr. Hogan and that

the Director was making policy when he found that Danigeles was responsible for the billings generated from her office. See *Heabler*, 2013 IL App (1st) 111968, ¶ 19.

¶ 87                                    Evidentiary Rulings

¶ 88    Danigeles next argues that the Director's decision must be reversed because he improperly excluded mitigating evidence from the testimonies of Dr. Bertagni, Hayes, and Spetly as irrelevant. Danigeles asserts the testimony from these witnesses was relevant because: (1) Dr. Bertagni's testimony established that a clerical error could have occurred with respect to the billing for treatment on certain unerupted teeth of the M family children; (2) Hayes established that it was unlikely that the treatment notes were authored by Danigeles; and (3) Spetly's testimony indicated that someone other than Danigeles worked at Danigeles' dental office.

¶ 89    As previously discussed, "[a]n administrative decision will not be overturned because the administrative judge failed to observe the rules of evidence unless the error 'materially affected the rights of any party and resulted in substantial injustice to [the party].' " *Kafin*, 2012 IL App (1st) 111875, ¶ 38 (quoting 735 ILCS 5/3-111(b) (West 2008) and *Matos*, 401 Ill. App. 3d at 541). According to the Illinois Administrative Procedure Act (5 ILCS 100/10-40(a) (West 2012)), "Irrelevant, immaterial, or unduly repetitious evidence shall be excluded." See 225 ILCS 25/55 (West 2012) (Illinois Administrative Procedure Act applies to proceedings under the Act). We review an administrative agency's decision regarding the admission of evidence for an abuse of discretion. *Matos*, 401 Ill. App. 3d at 541.

¶ 90    According to Danigeles, Dr. Bertagni's testimony supports her theory that there was a "chart mix-up" between the M family children and Marc and Marisol K. Our review of the record, however, reveals that Dr. Bertagni's testimony does not support Danigeles' assertion.

Danigeles' records demonstrate that she billed M.M. and K.M. for three-surface restorations on teeth 23, 24, 25, and 26; however, Dr. Bertagni observed that Marc K. had three-surface restorations on teeth 23, 24, 25, and a two-surface restoration on tooth 26. He further observed that Marisol K. had three-surface restorations on teeth 23, 24, and 25, but a one-surface restoration on tooth 26. Had the Director considered this testimony, it would have prejudiced Danigeles. Additionally, regardless of whether or not a "chart mix-up" occurred, the evidence demonstrated that Danigeles billed for services not rendered.

¶ 91    Danigeles also asserts that Hayes' and Spetly's testimonies regarding the authorship of the treatment notes should not have been excluded. She contends that the evidence that another dentist authored the treatment notes was relevant to her defense that "she did not engage in an *intentional* fraudulent billing scheme to obtain practice, money, or other things of value." (Emphasis added.) The element of intent, however, is not part of the Act. See 225 ILCS 25/23(9) (West 2012). In addition, the Director agreed with the ALJ's conclusion that Danigeles did not willfully make or file false records or reports in her practice as a dentist in violation of section 22 of the Act (225 ILCS 25/23(22) (West 2012)). Moreover, it was undisputed that the treatment notes and the billing records were generated from Danigeles' dental office. The Director excluded the testimonies of Hayes and Spetly due to the fact they were irrelevant in light of his finding that Danigeles, as the owner of the dental practice, was responsible for the billing records generated from her practice. Our review of the record indicates that the evidence supports this conclusion, thus, the Director did not abuse his discretion.

¶ 92                                    Sanction Imposed

¶ 93    Danigeles contends the sanction imposed, the revocation of her dental license and the imposition of a $125,000 fine, was unfairly excessive. The standard of review is whether the

Director abused his discretion in the imposition of the sanction. *Kafin*, 2012 IL App (1st) 111875, ¶ 42; *Reddy v. Department of Professional Regulation*, 336 Ill. App. 3d 350, 354 (2002). The Director abuses his discretion when a sanction is imposed that is "(1) overly harsh in view of the mitigating circumstances or (2) unrelated to the purpose of the statute." *Siddiqui v. Department of Professional Regulation*, 307 Ill. App. 3d 753, 763 (1999). On review, "[w]e must defer to the administrative agency's expertise and experience in determining what sanction is appropriate to protect the public interest." *Reddy*, 336 Ill. App. 3d at 354. A hearing officer may consider sanctions imposed in similar cases, but each case must be considered on its merits. *Siddiqui*, 307 Ill. App. 3d at 764. It is for the Department to determine the appropriate sanction in each case. *Id.*

¶ 94    We first examine whether the punishment was overly harsh, arbitrary, or unreasonable in view of mitigating circumstances. *Kafin*, 2012 IL App (1st) 111875, ¶ 43. Danigeles argues that the Department failed to present the Director with "a single case involving similar allegations to justify subjecting [her] to such egregious punishment." Danigeles notes that only two of the cases cited by the Department, those of Dr. Koe and Dr. Ostro, contain facts similar to the present matter; however, even in those cases the dentists did not receive penalties as severe as the sanctions she received. According to Danigeles, her case differs from Dr. Koe's and Dr. Ostro's cases because she "has not been previously found guilty of engaging in insurance fraud numerous times." Danigeles specifically contends "this is the first occasion on which [she] has been found guilty of anything at all" due to the fact she "accepted pleas" in 2001 and 2009.

¶ 95    We initially note that Danigeles fails to acknowledge that in 1994 she entered into a consent order regarding allegations substantially similar to those of the matter at bar. In addition, Danigeles is also incorrect in her assertion that Dr. Koe and Dr. Ostro were "previously

found guilty of engaging in insurance fraud numerous times." Included in the appellate record were the disciplinary orders involving Dr. Koe and Dr. Ostro which the Department had attached to its response to Danigeles' motion for rehearing. The orders involving Dr. Koe revealed that in 1997 and 2011 he entered into consent orders with the Department (Consent Order No. 96-8524 (entered Dec. 12, 1997); Consent Order No. 09-7297 (entered June 1, 2011)). Similarly, Dr. Ostro was also disciplined by consent order in 1995 (Consent Order No. 91-5978 (entered July 13, 1995)) and entered into a settlement agreement with the Department in 1999 (Settlement Agreement No. 94-1062 (entered April 20, 1999)). The only matter where the parties did not enter into some form of agreement as to discipline was when Dr. Ostro was found guilty of violating numerous provisions of the Act including a pattern of over-billing patients, particularly those of modest means, demonstrating a substandard level of care to his patients, and failing to maintain patient records. Specifically, the Department established that Dr. Ostro held down a patient who did not want further dental treatment, causing her bruising. As a result of these findings, Dr. Ostro's license was indefinitely suspended for two years and he was ordered to pay a $40,000 fine. Order No. 03-7378 (entered June 7, 2005).

¶ 96    Danigeles does not provide us with any authority that supports the proposition that a disciplinary decision was unreasonable because the Department failed to consider unrelated cases. Although "the hearing officer may consider sanctions imposed in similar cases," "each case must be considered on its merits [citation], and it is for the Department to determine the appropriate sanction in each case." *Siddiqui*, 307 Ill. App. 3d at 764; see *Robbins v. Department of State Police Merit Board*, 2014 IL App (4th) 130041, ¶ 50 (declining to consider whether a discharge was unreasonable because the agency failed to consider unrelated cases in making its determination).

¶ 97    Danigeles further contests the sanctions imposed against her as "draconian" and "grossly at odds with published decisions where courts have found far more significant violations of the Medical Practice Act."  Danigeles cites the cases of *Pundy v. Department of Professional Regulation*, 211 Ill. App. 3d 475 (1991), *Reddy*, and *Parikh v. Division of Professional Regulation of the Department of Financial & Professional Regulation*, 2012 IL App (1st) 121226, in support of her conclusion that the Director's sanction was erroneous.  We find these cases to be factually distinguishable.  We initially acknowledge that the cases relied upon by Danigeles involve the Medical Practice Act of 1987 (225 ILCS 60/1 *et seq.* (West 2012)) or the Medical Practice Act of 1983 (Ill. Rev. Stat. 1983, ch. 111, ¶ 4433(5)) (collectively referred to herein as the Medical Practice Act).  Notably, the Medical Practice Act does not allow the Department to fine a medical practitioner for violations of the act.  In addition, the Medical Practice Act includes numerous other violations not incorporated into the Act that would support the revocation of a medical license.  See 225 ILCS 60/1 *et seq.* (West 2012)).

¶ 98    Initially, we note that *Parikh* is inapposite to this matter as it involved an interlocutory appeal to this court after the circuit court denied the plaintiff's emergency motion to stay the Director's order suspending his medical license indefinitely for a minimum of one year.  *Parikh*, 2012 IL App (1st) 121226, ¶¶ 20-21.  Accordingly, we decline to consider it.

¶ 99    Turning to the other two cases upon which Danigeles relies, in *Pundy* the Department filed a three-count complaint against a psychiatrist for engaging in professional misconduct premised on a sexual relationship he had with a patient.  *Pundy*, 211 Ill. App. 3d at 478.  Although charged with two other violations of the Medical Practice Act, ultimately the Department only found the psychiatrist guilty of " '[e]ngaging in dishonorable, unethical or unprofessional conduct of a character likely to deceive, defraud or harm the public.' "  *Id.* at 485

(quoting Ill. Rev. Stat. 1983, ch. 111, ¶ 4433(5)). The psychiatrist's license was suspended for six months and he was placed on probation for a period of two years. *Id.* at 488. On appeal, the psychiatrist challenged this sanction as overly harsh. *Id.* We disagreed and affirmed the discipline imposed. *Id.*

¶ 100 In *Reddy*, a psychiatrist fell in love with and married his patient. He was subsequently disciplined because the evidence demonstrated he violated three sections of the Medical Practice Act: unethical and unprofessional behavior (225 ILCS 60/22(A)(5) (West 2000)); immoral behavior (225 ILCS 60/22(A)(20) (West 2000)); and an inability to practice with a reasonable degree of judgment due to a mental illness (225 ILCS 60/22(A)(27) (West 2000)). *Reddy*, 336 Ill. App. 3d at 355. The psychiatrist was sanctioned with a six-month suspension of his license and he was prohibited from supervising other medical practitioners. *Id.* On appeal, the psychiatrist argued his sanction was unduly harsh. *Id.* The reviewing court, however, upheld the sanctions noting that the Department reviewed the mitigating evidence and deferred to the Department's expertise. *Id.*

¶ 101 The unprofessional behavior and violations of the Act in this case are markedly distinguishable from the facts of *Pundy* and *Reddy*. First, Danigeles was charged and found to have violated 19 counts, not one single count (*Pundy*) or three counts (*Reddy*). Second, the unprofessional behavior of both psychiatrists affected only one patient, whereas Danigeles' behavior affected four patients. Third, neither psychiatrist had a history of prior discipline or a blatant disregard for the professional standards set forth in the Medical Practice Act, whereas here Danigeles has had three prior consent orders, two that involved fraudulent billing. In addition, no evidence was before the Director that indicated that Danigeles suffered from a mental illness, a fact which served to mitigate Dr. Reddy's sanction.

¶ 102    Danigeles also argues that her punishment was overly harsh because the amount she actually overbilled was not considered by the Director in determining the fine imposed.  The record reflects, however, that the Director had before him all of the relevant evidence, including the insurance claims and the testimony of Dr. Kenney, in order to determine and consider the amount she overcharged.

¶ 103    Deferring to the Director's expertise and experience as we must, our review of the record reveals that the sanction imposed was neither unreasonable nor arbitrary.  See *id.*  The relevant portion of the Act permits the Department to revoke a dental license for "any one" of the enumerated violations.  225 ILCS 25/23 (West 2012).  The Department may also choose to impose "fines not to exceed $10,000 per violation."  *Id.*  Here, Danigeles was a repeat offender, having had her dental license suspended or reprimanded by the Department in 1994, 2001, and 2009.  Particularly relevant to this cause are the numerous times in the past 20 years where her license has been suspended for allegations substantially similar to those alleged in the case at bar.  Specifically, Danigeles has been previously disciplined on more than one occasion for "[o]btaining or seeking to obtain practice, money, or any other things of value by false or fraudulent representations" (225 ILCS 25/23(9) (West 2012)) and "repeated irregularities in billing for services rendered to a patient" (225 ILCS 25/23(25) (West 2012)).  In addition, Danigeles had been previously fined $12,500, $5,000, and $35,000, respectively.  Notably, Danigeles was on probation when the Department filed the amended complaint at issue here, a fact the Director likely took into consideration when issuing the sanction.

¶ 104    The Director stated the discipline was based on a variety of factors, including: "(1) the seriousness of the offenses, (2) the presence of multiple offenses, (3) Respondent's prior disciplinary history, (4) the impact of offenses on the injured parties, (5) Respondent's lack of

contrition for the offenses, and (6) financial gain to the Respondent as a result of committing the offenses." The Director also determined that Danigeles' behavior warranted discipline for 19 violations of the Act involving four patients. As previously discussed, because the Act allows for a fine of up to $10,000 per violation, we cannot say the Director's decision to fine Danigeles $125,000 for 19 violations of the Act was arbitrary, unreasonable, or harsh. See 225 ILCS 25/23 (West 2012). This is particularly true in light of the fact that the previously issued fines in lower amounts did not discourage Danigeles from similarly violating the Act. On all of these facts, the Director committed no abuse of discretion in sanctioning Danigeles by revoking her dental license and prescribing a $125,000 fine.

¶ 105    Finally, we consider whether the punishment was unrelated to the purpose of the statute. The purpose of the Act is to protect the public health and welfare from those not qualified to practice dentistry. 225 ILCS 25/2 (West 2012); *Chastek v. Anderson*, 83 Ill. 2d 502, 509 (1981) (the purpose of the Act is to protect the public from "people unfit to practice"). In addition, the Act provides that the Department may revoke a dentist's license for any one or a combination of 31 enumerated reasons. See 225 ILCS 25/23 (West 2012). In this case, Danigeles' license was revoked based on her unethical and unprofessional conduct regarding four patients. Specifically, Danigeles was found to have fraudulently billed two insurance companies numerous times, including double billing and charging for work not performed. Further, she falsely stated on the insurance claim forms that the patients did not have a secondary insurance when that was plainly untrue. Danigeles' repeated and brazen conduct put the public's welfare in jeopardy. Thus, based on the facts presented, it was not unreasonable for the Director to enter these sanctions against her. We therefore defer to the experience and expertise of the Department in these matters and affirm its order.

¶ 106                          CONCLUSION

¶ 107   For the reasons stated we affirm the determination of the circuit court of Cook County upholding the Director's determination to revoke Danigeles' dental license for a minimum of five years and impose a $125,000 fine.

¶ 108   Affirmed.