2023 IL App (1st) 220735-U
No. 1-22-0735

FIRST DIVISION
November 20, 2023

**NOTICE:** This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

IN THE
APPELLATE COURT OF ILLINOIS
FIRST JUDICIAL DISTRICT

| | | |
|---|---|---|
| THOMAS J. BILLUPS, | ) | Direct Appeal of Order of the |
| | ) | Board of Education of the City |
| | ) | of Chicago. |
| Petitioner-Appellant, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| CHIEF EXECUTIVE OFFICER OF THE | ) | No. 22-0427-RS4 |
| BOARD OF EDUCATION OF THE CITY OF | ) | |
| CHICAGO, | ) | |
| | ) | |
| Respondent-Appellee. | ) | |

JUSTICE PUCINSKI delivered the judgment of the court.
Presiding Justice Smith and Justice Coghlan concurred in the judgment.

**ORDER**

*Held*:      We affirm the decision of the Board of Education of the City of Chicago dismissing petitioner-appellant Thomas Billups for cause, following a second evidentiary hearing upon remand from an October 2019 order of this court. The findings of the Board supporting its decision to dismiss Billups were not against the manifest weight of the evidence. Billups' remaining challenges to the conduct and rulings of the hearing officer are also without merit.

¶ 1        This is petitioner-appellant Thomas Billups' second appeal concerning the decision of the Board of Education of the City of Chicago (Board) to terminate his employment as a teacher in the Chicago Public Schools (CPS), based on his failure to successfully complete remediation. In a prior appeal from the Board's initial termination decision, we reversed but remanded for the Board to make certain additional factual findings. *Billups v. Chief Executive Officer of the Board of Education of the City of Chicago*, 2019 IL App (1st) 180463-U. Upon remand, following an additional evidentiary hearing, the Board issued a new decision in 2022 making new findings and again concluding that Billups should be dismissed. Billups now appeals that Board decision. For the following reasons, we affirm the decision of the Board.

¶ 2        I. BACKGROUND

¶ 3        Billups was a tenured math teacher in CPS for several years prior to his termination in 2016. He taught at the Nathan R. Goldblatt Elementary School (Goldblatt) until it was closed by CPS. During the 2012-13, 2013-14, and 2014-15 school years, he taught middle school math as a tenured teacher at the Helen M. Hefferan STEAM Elementary School (Hefferan).[1] During his time at Hefferan, he received an unsatisfactory rating and thus became subject to a remediation plan.

¶ 4        Billups was subsequently hired by Lovett Elementary School (Lovett) for the 2015-16 school year, during which he was subject to a 90-day remediation plan formulated by Lovett's principal, Leviis Haney. Haney selected Chinita Williams as a consulting teacher to provide advice to Billups. As part of the remediation plan, Haney conducted midpoint and final evaluations in which Haney observed Billups' classroom. After the final evaluation, Haney determined that Billups' overall rating was unsatisfactory.

---

[1] Hefferan's principal, Jacqueline Faye Hearns, testified that "STEAM" refers to "science, technology, engineering, and math" and that the "A represents arts."

¶ 5        On August 10, 2016, the Chief Executive Officer (CEO) of the Board approved dismissal charges against Billups, based on Haney's determination that Billups "failed to attain a 'proficient' or better level of teaching performance following 90 school days of remediation."

¶ 6                                A. The 2017 Evidentiary Hearing

¶ 7        Billups requested a hearing on the charges. Hearing officer Anne Weiland conducted a hearing on August 2017, at which Billups was represented by counsel.

¶ 8        The Board presented the following witnesses: (1) Amanda Smith, a CPS employee "in the manager role of remediation and professional development"; (2) Mabel Williams-Wimberly, an assistant principal at Hefferan; (3) Hefferan's principal, Jacqueline Faye Hearns; (4) Samantha Lam, a former assistant principal at Lovett; and (5) Haney, the principal of Lovett.

¶ 9                                    1. Smith's Testimony

¶ 10        Smith described CPS's teacher evaluation system, which is known as "REACH."[2] She explained that teachers are rated on 19 components with four possible ratings for each: unsatisfactory, basic, proficient, and distinguished. The ratings are based on formal classroom observations of CPS teachers. Each teacher also receives a total rating within one of four ranges: unsatisfactory, developing, proficient, and excellent. Tenured teachers who receive two consecutive "developing" ratings default to an unsatisfactory rating. Teachers receiving an unsatisfactory rating are subject to a 90-day remediation plan.

---

[2] Smith testified that "REACH is Chicago's teacher evaluation system that aligns with the PERA [Performance Evaluation Reform Act] mandate." She explained that PERA was the "state law that require[d] all school districts in the state of Illinois to implement a new teacher evaluation system." See Pub. Act 96-861 (eff. Jan. 15, 2010) (amending 105 ILCS 5/24A-5); see also "Teacher Evaluation in Chicago Public School: Analysis of the REACH Educator Evaluation and Support System, Five Years In", https://consortium.uchicago.edu/publications/teacher-evaluation-in-CPS-REACH-five-years-in ("In response to the 2010 Illinois Performance Evaluation Reform Act *** CPS implemented the REACH (Recognizing Educators Advancing Chicago's Students) teacher evaluation system in 2012-13.").

¶ 11 Smith explained that a tenured "consulting teacher" is selected to coach a teacher undergoing remediation. However, a consulting teacher does not conduct evaluations. Teachers in remediation receive two formal observations: once at the midway point and again at the conclusion of the remediation period.

¶ 12 Smith testified that during the 2013-14 and 2014-15 school years, Billups received a total rating of "developing." Thus, his rating defaulted to "unsatisfactory", so he was subject to a remediation plan for the 2015-16 school year. At the conclusion of the remediation plan, he received an unsatisfactory rating.

¶ 13        2. Williams-Wimberly's Testimony

¶ 14 Williams-Wimberly testified that she was an assistant principal at Hefferan, where Billups taught middle school math. During the 2013-14 school year, she rated him as "developing" on the component of designing coherent instruction, as he was not using "instructional grouping" and was not "differentiating the instruction" to address different students' learning styles.

¶ 15 In the 2014-15 school year, Williams-Wimberly and Hearns met with Billups and suggested that he implement "instructional groupings" of students. Williams-Wimberly stated that after the last formal evaluation, Billups had not modified his approach. Billups transferred to a new school (Lovett) following the 2014-15 school year.

¶ 16        3. Hearns' Testimony

¶ 17 Hearns, Hefferan's principal, testified that she hired Billups during the 2012-13 school year and developed a professional development plan for him for the 2013-14 school year. She suggested that Billups use small group instruction rather than the "whole group style" she observed. Similarly, Hearns suggested that Billups use "differentiated homework" because his students were "on different levels," even if they were in the same grade. During the 2014-15 school

year, Hearns gave Billups a "basic" rating in a number of areas. She found that Billups was "resistant to differentiating assignments", observing that his students "tended to all be working on the same assignments" regardless of skill level.

¶ 18    Hearns also rated Billups as "basic" in "managing student behavior," finding that he inconsistently disciplined students for inappropriate and disrespectful behaviors. She also gave him a "basic" rating with respect to "engaging students in learning" because only some students were actually engaged in the lesson.  Hearns also observed that Billups asked very few "high-level" questions. She did not believe Billups' teaching performance improved in the 2014-15 school year.

¶ 19                            4. Lam's Testimony

¶ 20    Samantha Lam testified that she was Lovett's assistant principal when Billups taught there during the 2015-16 school year. She informally observed Billups and found his lessons were "one-size-fits-all" and "did not appear to be differentiated." Lam also recalled that Billups used "low-level questioning in terms of *** knowledge and understanding level." Lam acknowledged that there was schoolwide improvement test scores at Lovett in the 2015-16 school year.

¶ 21                            5. Haney's Testimony

¶ 22    Haney testified that he became Lovett's principal in 2012. As principal, he coached teachers to use a "targeted small group instructional manner" rather than "teaching to the whole group."

¶ 23    When Haney hired Billups to teach at Lovett for the 2015-16 school year, he did not know that Billups would be rated unsatisfactory for the prior school year. After Haney learned that Billups was rated unsatisfactory, Haney selected Chinita Williams to serve as a Billups' consulting teacher during his remediation plan.  In December 2015, Haney and Williams met with Billups to

discuss the plan. Haney discussed several recommendations. Among these, the remediation plan suggested that Billups use a reporting tool called Descartes, which was based on "beginning of year [student] assessment[s]", to create groupings of students and provide differentiated instruction "based on what the Descartes said that the students needed to learn." Haney's remediation plan also suggested that Billups "script high-level questions in advance." Haney testified that each of Billups, Williams, and Haney agreed to and signed the remediation plan.

¶ 24    In March 2016, Haney observed Billups in a midpoint evaluation. Haney rated Billups as "unsatisfactory" with respect to "designing a coherent instruction" that connected related subjects. Haney gave "basic" ratings on a number of other components, including with respect to using differentiated assignments and questioning and discussion techniques. Haney observed that "students were working on different problems, but it was the same level." Haney did not observe Billups using "higher-level questions" for student discussion.

¶ 25    On May 31, 2016, Haney conducted a final observation of Billups' classroom teaching, a 7th grade math class. Haney's corresponding written report was admitted into evidence. Within the REACH evaluation framework, Haney rated Billups "unsatisfactory" in "designing coherent instruction" due to the lack of "evidence of inclusion of science and other related subjects." Haney rated Billups "basic" with respect to "designing student assessments" because he did not see that "assessments were adaptive for different groups of students."

¶ 26    Haney also rated Billups "unsatisfactory" for managing student behavior, questioning and discussion techniques, and engaging students in learning. Haney also gave Billups a "basic" rating on a number of other components. Based on the average of the component ratings from the final observation, Billups' overall rating was "below proficient" and "defaulted to unsatisfactory."

¶ 27        Haney acknowledged that during the 2015-16 school year, Lovett improved from the 34th percentile to the 98th percentile in standardized test scores for math. Haney could not say how much of the improvement was attributable to Billups.

¶ 28        During the 2017 hearing, the Board admitted into evidence Billups' remediation plan, which included the signatures of Billups, Haney, and Williams dated December 4, 2015. The Board also admitted Williams' consulting teacher logs, including her observations of Billups' classes and coaching notes. Multiple entries in Williams' logs, ranging from January to May 2016, stated that Billups could not show her "how he groups students and the materials used for small group work."

¶ 29        6. Billups' Testimony

¶ 30        Billups testified that he taught middle school math at Goldblatt until the school closed, after which he taught at Hefferan. In his view, Hefferan heavily emphasized test scores. Billups indicated that he decided to leave Hefferan because he felt pressured to cheat by helping students on standardized tests.

¶ 31        Billups left Hefferan following the 2014-15 school year. After he learned that Lovett had a math teaching position available, Billups was hired after he interviewed with Haney.

¶ 32        At Lovett, Billups was the exclusive teacher for 6th, 7th and 8th grade math. After he started at Lovett, in approximately November 2015, he was informed that he was going to be in remediation. Haney contacted him about a remediation plan. Billups recalled an initial remediation meeting with Haney and Williams, although he denied that he received a copy of the remediation plan.

¶ 33        Billups recalled that Williams observed a number of Billups' classes and provided him with consulting teacher logs from December 2015 to May 2016. Willams had both positive and negative comments. Billups testified that he tried to implement Williams' suggestions.

¶ 34        Billups testified that he did not meet with Haney very often during the remediation plan, although he did recall discussing differentiation with him. Billups testified that he used students' standardized scores to place them into groups according to their skill level. Billups stated that, in accordance with Haney's suggestion, he accessed materials from Descartes and other resources. Nevertheless, Billups' rating from observations worsened as the remediation period proceeded. Billups testified he felt that Haney was biased against him. Billups believed that after Haney learned he was on remediation, he felt that Haney "had to make sure that his observations*** jibed or matched those observations of Dr. Hearns" from his prior school, Hefferan.

¶ 35        Billups testified that his students' standardized test scores went up in all of his classes. He believed he had "everything to do with" the increases.

¶ 36        Billups testified that he made efforts to differentiate his assignments among students of different skill levels. For example, he distributed handouts that contained questions of varying difficulty and assigned different problems to different groups of students. Billups also testified that he asked high-level questions of his students.

¶ 37        After the witnesses testified at the hearing, Billups' counsel stated on the record that "we had asked [consulting teacher] Chinita Williams to come," but she had left before being questioned.

¶ 38        The Board and Billups submitted written post-hearing submissions. The Board argued it had proven by a preponderance of the evidence that that Billups "did not improve his unsatisfactory teaching performance to proficient" by the end of remediation. Billups argued that he was an

excellent teacher, but that Haney was "unfairly critical and biased" against him, especially after learning that Billups had received an unsatisfactory rating at his prior school. He claimed that Haney's evaluation "minimized [his] strengths and magnified his deficiencies."

¶ 39        B. Hearing Officer Weiland's Findings and the Board's Termination Decision

¶ 40        On November 16, 2017, hearing officer Weiland issued her findings of fact and recommendations. She found that that Billups "had ample notice of the areas of instruction that he needed to improve." She found that the evidence showed that Billups "did not differentiate based upon instructional skill level, but rather varied whole group instruction to address differences in learning style."

¶ 41        Weiland recognized Billups' contentions that the remediation plan failed to clarify the concept of differentiation and did not assist him to implement Lovett's expectations. Yet, Weiland found that the "REACH framework and the remediation system provided clear and specific rubrics and examples" of what Haney was looking for in a proficient teacher. Weiland found that although Billups "genuinely desired to provide good instruction," his efforts "did not meet the proficient level of instructional expectations of REACH." She concluded that Billups failed to achieve a proficient rating and should be dismissed.

¶ 42        On January 24, 2018, the Board issued a resolution in which it adopted Weiland's findings and recommendation for discharge. The Board notified Billups of his termination by letter, which also informed him of his right to seek judicial review of the decision under section 34-85 of the Illinois School Code (105 ILCS 5/34-85 (West 2018)).

¶ 43        C. Billups' Prior Appeal and This Court's Remand Order

¶ 44 Billups appealed the Board's decision (no. 1-18-0463). He argued: (1) there was an unreasonable delay in the hearing and the hearing officers' findings; (2) his due process rights were denied because he could not present Williams as a witness and because he and Williams did not receive the remediation plan in a timely manner; and (3) the Board did not meet its burden to prove that he failed the remediation plan.

¶ 45 In October 2019, this court reversed the Board's decision but remanded for further proceedings. *Billups v. Chief Executive Officer of the Board of Education of the City of Chicago*, 2019 IL App (1st) 180463-U (Oct. 15, 2019) (unpublished order under Rule 23). We rejected Billups' arguments relating to the timeliness of the hearing and due process claims. See *id.* ¶¶ 60-82. However, with respect to his claim that the Board had not met its burden of proof, we determined the Board had not made certain necessary factual findings.

¶ 46 We recognized that the Board must prove charges supporting a tenured teacher's dismissal by a preponderance of the evidence, and that a tenured teacher may only be dismissed for cause. *Id.* ¶ 85 (citing *Beggs v. Board of Education of Murphysboro Community Unit School District No. 186*, 2016 IL 120236, ¶ 53; *Davis v. Board of Education of City of Chicago*, 276 Ill. App. 3d 693, 697 (1995)). We also recognized that "failure to complete a remediation plan with a satisfactory or better rating constitutes cause for dismissal." *Id.* (citing *Davis*, 276 Ill. App. 3d at 697).

¶ 47 We noted that the Board had not made its own findings of fact but adopted the findings of the hearing officer. *Id.* ¶ 87. We determined that the "hearing officer did not make a number of factual determinations that were material to determining whether Billups failed to successfully complete his remediation plan." Our decision specified five separate areas for which necessary findings were missing.

¶ 48         First, we found that the Board "failed to make or adopt any findings as to how differentiation should be defined or implemented, particularly in the context of middle school math." *Id*. ¶ 88. We noted that Billups' lower ratings were "largely based on his apparent failure to practice differentiation in the classroom." *Id*. However, there were no factual findings as to the definition of differentiation, why Billups's attempts did not constitute proper differentiation, or "how Billups should have practiced differentiation in the context of middle school math." *Id*. ¶ 91.

¶ 49         Second, although Billups received an unsatisfactory rating for managing student behavior in his final evaluation, the Board did not make or adopt any factual findings as to "whether Billups' ability to discipline his students was sufficiently poor enough to support the lower ratings" he received. *Id*. ¶ 92. Third, although Billups received negative feedback for failing to coordinate his classes with other subjects, the Board made "no findings as to how Billups should have combined other classes' subject matter with middle school math." *Id*. ¶ 93. Fourth, despite the testimony that Billups failed to present "high-level" questions to his students, the Board included no findings as to what constitutes a "high-level" question, or whether Billups failed to ask enough "low" or "high-level" questions. *Id*. ¶ 94.

¶ 50         Finally, we noted the evidence that Lovett's math test scores increased while Billups was the exclusive middle school math teacher. *Id*. ¶ 95. However, the Board did not make or adopt any findings of fact "as to why Billups's performance as a teacher was unsatisfactory despite this evidence suggesting improvement in middle school math." *Id.*

¶ 51         In sum, our 2019 order concluded that the Board made "no findings that Billups' alleged failure to properly implement differentiation, along with Billups's other purported failures, were substantial enough to support a finding of 'cause'" for his termination. *Id*. We reversed and

remanded for further proceedings "as to the absent factual determinations" discussed in the order. *Id.* ¶ 96.

¶ 52                    D. Proceedings on Remand and the 2021 Evidentiary Hearing

¶ 53        Following our order, the original hearing officer (Weiland) declined to participate in further proceedings in the case. In March 2020, the parties agreed to select Thomas Sonneborn to serve as hearing officer to make the additional factual determinations called for by our order. The parties expressed their view that the requisite factual findings could be made from the existing record. However, they recognized that Sonneborn could elect to convene a new hearing for presentation of additional evidence. Sonneborn subsequently concluded that the existing record was not sufficient to make the findings deemed necessary by our October 2019 order, such that an additional evidentiary hearing was necessary.

¶ 54        The hearing began on July 22, 2021. Whereas Billups was represented by counsel at the 2017 hearing, he appeared *pro se* at the 2021 hearing.

¶ 55        The Board presented the testimony of three witnesses: Amanda Smith, Haney, and Anika Murphy.

¶ 56                                  1. Smith's Testimony

¶ 57        Amanda Smith testified that she was a "Senior Manager for Educator Effectiveness" at CPS. She was responsible for managing teacher evaluations, including remediation plans. She described the CPS framework for teacher evaluations, including performance ratings on 16 separate components. She explained that remediation plans include two formal observations, the 45th day midpoint observation and the final 90th day observation. To successfully remediate, "an educator will need to hit a level of proficiency on their final 90th day observation." Smith testified that student test scores "are not used in the remediation plan."

¶ 58    Smith testified that Billups' rating after the final 90th day observation was 204. To attain proficiency, he needed at least a rating of 284.5. That is, Billups would have needed an additional 80 points across the 16 components to achieve proficiency.

¶ 59                                2. Haney's Testimony

¶ 60    Haney testified that he had left CPS in 2018 after five years at Lovett. He was shown the remediation plan that he composed for Billups. As part of the plan, Haney suggested that Billups use printouts from "Descartes." He described Descartes as a data point generated for each student based on results of a standardized test. Haney said that Descartes was "useful in helping teachers to differentiate" and group students based on test scores.

¶ 61    When asked to explain differentiation, Haney testified:

> "Differentiation is providing students with specific targeted instruction based on where they are instructionally. And so in any given classroom, students can be at multiple levels. You know *** an 8th grade student can be performing at a 6th grade level. So differentiation means that we don't give the kid 8th grade instruction, we give them instruction that's a little bit above a 6th grade level to help sort of pull that student along and keep the student engaged in instruction."

¶ 62    Haney expected teachers to differentiate based on results of formative assessments given three times a year, as well as weekly assessments. Haney testified that he did not see evidence that Billups used Descartes or weekly assessments to demonstrate that he was aware of individual students' needs in order to plan differentiation. Haney acknowledged that he saw "some evidence"

that Billups grouped students during the midpoint and final evaluations, but he could not tell how the students had been grouped.

¶ 63    When asked to explain what a "high-level" question is, Haney answered: "A high-level question is a question that requires students to use multiple skills in order to solve or answer the question." In contrast, he explained that "[l]ow-level questions have a specific response" that can be answered in "very few words." Haney recommended that Billups script high-level questions in advance of his lessons, but he saw no evidence that Billups did so.

¶ 64    Haney further testified that as part of the remediation plan, he recommended that Billups work with two other teachers as part of "collaborative lesson planning." According to Haney, the expectation was to incorporate math, social studies and language arts "to help students see the connection between the subjects" and allow teachers to create lessons that were "more engaging and more project-based." Haney testified he selected two teachers for Billups to collaborate with, but he that he did not see evidence of such collaboration uploaded in the Reflect and Learn System ("RLS").[3]

¶ 65    Haney testified that when he conducted the midpoint evaluation in March 2016, he expected Billups to use students' "middle of the year data" from Descartes to help differentiate instruction. However, Billups had not done so.

¶ 66    Regarding the final evaluation on May 31, 2016, Haney testified he rated Billups as unsatisfactory in "designing coherent instruction," as he did not see sufficient evidence that Billups used information about students' individual needs to provide differentiated instruction." Haney similarly testified that he gave Billups a basic rating for the "designing student assessment"

---

[3]    The record reflects that the Reflect and Learn System (RLS) is a computerized system through which CPS teachers can upload lesson plans and other related information which is viewable by administrators. As stated by hearing officer Sonneborn in his findings, RLS is "designed to facilitate professional interaction and dialogue at CPS."

component, because teachers should "design student assessments that are appropriate for each student group," which requires differentiation.

¶ 67       Haney also recalled that during his final observation of Billups' class, students became disinterested and some students were not following the lesson. Although the students "weren't loud and boisterous," Haney gave Billups less than a proficient rating in managing student behavior because he observed instances of "off-task behavior." Some students were having unrelated conversations, laughing, and cursing, and at one point one student "popped another one on the shoulder." Haney observed that Billups did not respond to these misbehaviors. Haney testified that a proficient teacher would be heavily involved in correcting students, but that Billups "was not walking around and monitoring groups" to control behavior.

¶ 68       Haney testified he gave Billups an unsatisfactory rating for the component regarding "questioning and discussion techniques," based on his lack of high-level questioning. Billups was asking "low-level" questions with "yes" or "no" responses.

¶ 69       Haney also stated that he gave Billups an unsatisfactory rating in the component for "engaging students in learning," mainly due to lack of differentiation.

¶ 70       Haney gave Billups a basic rating for "using assessment and instruction." He acknowledged that Billups walked around the classroom and monitored student progress. However, Billups did not have clear rubrics, so students did not know the criteria by which they were being assessed.

¶ 71       Haney gave Billups an unsatisfactory rating for the component of "demonstrating flexibility and responsiveness." Haney saw students "needing a multitude of different supports." However, he did not see evidence that Billups incorporated the different learning styles of his students into the lesson.

¶ 72     Haney recalled that he was surprised when he learned that Billups would be on a remediation plan, but he denied that he was biased against Billups. Haney testified that student test scores are not allowed to be used in a teacher's evaluation, "only the teacher's practice." Haney acknowledged that Lovett had "tremendous growth" in test scores throughout its classrooms.  He attributed this largely to a schoolwide approach where "students took ownership of their own learning and completed activities on the programs on their own." Haney said: "That's not to say that Mr. Billups didn't have anything to do with that, I'm not saying that at all, but I will say that our expectations around differentiation and student ownership had a lot to do with student growth."

¶ 73                                3. Murphy's Testimony

¶ 74     The Board called Anika Murphy, an "instructional support leader" (ISL) with CPS, as an expert in mathematics instruction. Murphy testified that she had taught mathematics before she became an ISL, in which capacity she supported math teachers from kindergarten through 12th grade. Over Billups' objection, hearing officer Sonneborn allowed Murphy to testify as an expert.

¶ 75     Murphy described the concept of differentiation as "an opportunity to meet students where they are because they come in at different levels [and] giving them an opportunity to access learning, but also addressing their learning modalities." She stated that, to properly differentiate, a teacher should be "looking at student data" and adjusting as the school year progresses. Murphy had reviewed Billups' evaluations. She testified there was less evidence of differentiation in Billups' final evaluation than at his midpoint evaluation.

¶ 76     Murphy was asked about high and low-level questions. She explained "low questions are pretty much recall skills-type questions, like what's two plus two or call on a response to something that's already known." In contrast, higher level questions required analysis. She testified that teachers should script high and low-level questions ahead of time to help students move on to a

higher level of understanding. Murphy did not see evidence that Billups used high-level questions in the final evaluation.

¶ 77     Murphy acknowledged that Billups' final observation reflected that he placed students into groups. However, she testified that "grouping students doesn't necessarily mean that it's been differentiated for student learning" as students must be provided with the proper content to "meet[] them where they are."

¶ 78                               4. Williams' Testimony

¶ 79     Billups called Chanika Williams as a witness and asked her about portions of her consulting teacher logs. She agreed that notes from January 11, 2016 and January 15, 2016 indicated she had not yet received a written copy of the remediation plan. She acknowledged comments in her log in which she complimented the "learning environment" in Billups' classroom, stated that students felt comfortable asking questions, and that Billups asked probing questions. She acknowledged that "probing questions" included high-level questions. Williams agreed that Billups was encouraging and respectful when he addressed students.

¶ 80     Elsewhere, Williams testified that Billups was "pretty much a whole classroom teacher." She "constantly" suggested that he "start differentiating based on giving formative assessments" and grouping students that way. Billups was not grouping students at the beginning of the remediation period, but she "did see a conscious effort of [him] trying to do that." She acknowledged that a note from March 31, 2016 indicated that Billups had assigned students different tasks based on skill level. She agreed that she observed differentiation from that point on. Williams observed Billups place students in small groups, although she acknowledged she was "not sure of how they were put into those groups."

¶ 81        On cross-examination by the Board's counsel, Williams stated that Billups began to use differentiation around the midpoint of the 90-day remediation period. She was asked how she could say that he differentiated if she did not know how he grouped students. She responded: "[e]ven if you just pull out a small group *** that's differentiation." However, Williams acknowledged she could not attest to "whether that was the right group of students that he should have had there."

¶ 82        Williams stated that if she were to differentiate math students, she would do so based on formative assessments. She admitted she did not know whether Billups used data from Descartes to group students, as was suggested to him. She agreed that the remediation plan called for Billups to script high-level questions, but she did not see evidence that he did so. Williams acknowledged that she did not participate in the midpoint evaluation or Haney's final observation and evaluation.

¶ 83                                5. Billups' Testimony

¶ 84        Billups testified that he differentiated by using test score data to place students in small groups, with different groups receiving problems with different degrees of difficulty. He testified that he walked around the class assessing the students' progress, from which he determined which students would meet with him.

¶ 85        Billups testified that Haney never provided him with professional development resources regarding differentiation. Billups testified that he felt differentiation could be achieved by students using the same textbook or same worksheet, but that Haney did not agree. He felt Haney "preferred differentiation to be simply students working in the computer at whatever grade level they were assigned to work", whereas Billups used textbooks containing problems of varying difficulty. Billups believed his differentiation efforts were successful, based on his students' eagerness and "student achievement and student growth."

¶ 86    Billups described his approach to student discipline as "less confrontational, but still effective." He said a "simple look of disappointment" would usually be enough to correct any misbehavior. He testified that there were no complaints regarding his ability to manage students, and that his students' test scores reflected there was no issue.

¶ 87    Billups acknowledged that Haney recommended high-level questions. However, he claimed that Haney "provided no clarity" as to which questions were high-level or "how to facilitate the type of discussion that he wanted to see." He stated that if his questioning had been poor, his students' growth (as indicated by test data) would not have been possible. Regarding collaboration between his math class and other classes, Billups testified that he submitted a collaborative lesson plan, but Haney gave no specific directions on how the collaboration should look.

¶ 88    Billups believed that the observation process was "subjective to Mr. Haney's whims." He maintained that he did not receive a copy of the remediation plan, and that Haney did not provide professional development resources with specific instructions on how to differentiate. He maintained that Haney's observations were not credible.

¶ 89    On cross-examination, Billups agreed that "grouping students appropriately" is a requirement of properly differentiated instruction. He acknowledged that Haney asked him to use data from Descartes as part of the remediation plan. He testified that he used Descartes to break student into groups, but he admitted he did not upload any documents from Descartes into RLS at any time during the remediation plan. Asked why he had not done so, he said he did not think "it mattered that much" because in his experience, administrators did not need for him to "spell out" what he was doing. Billups maintained that Haney "never really specifically told me how [differentiation] should be done."

¶ 90    Billups elsewhere acknowledged that Haney asked him to script high-level questions. He admitted he "didn't write them down" because he thought the questions were only for his own reference, and not for Haney's viewing. Billups said he did not ask Haney for examples of high-level questions, because "26 years of teaching tells you what a high and low level question [are]." He also claimed that Haney did not indicate how many high or low-level questions he should use.

¶ 91    Billups testified there was nothing abnormal about student behavior during the final observation. He denied the instances of misbehavior that Haney recorded on that day, commenting that "I guess [Haney] wanted to make sure that I did not pass observation." Billups elsewhere acknowledged that student growth is not factored into his rating, "even though it should be." Billups said the evaluation process was subjective, and that his career should not be cut short because of "one day of observation and some paperwork that wasn't uploaded."

¶ 92                          E. Post-Hearing Submissions

¶ 93    The record reflects that Billups received hearing transcripts on September 8, 2021.[4] Sonneborn then informed the parties via email that the governing statute "calls for setting a [post-hearing] brief due date for 21 days after receipt of the transcripts," meaning September 29, 2021. See 105 ILCS 5/24-12 (West 2020) ("Any post-hearing briefs must be submitted by the parties by no later than 21 days after a party's receipt of the transcript of the hearing, unless extended by the hearing officer for good cause or by mutual agreement of the parties."). Sonneborn encouraged the parties to agree to extension of the due date, given the complexity of the case. The Board's counsel asked Billups to agree to extend the due date to October 4, 2021.

_____

[4] The record indicates that the Board's counsel and hearing officer Sonneborn received the transcripts earlier, in August 2021. However, it was apparently not until September 8, 2021 that Billups contacted the court reporting company and learned that the transcripts were available. In subsequent emails from September 2021 (and again in this appeal), Billups suggested that the Board's counsel and Sonneborn acted in bad faith because they did not specifically inform him once the transcripts were ready.

Billups refused to agree to any extension, stating that he had dealt with "delays and trickery on the part of CPS for the last five years."

¶ 94 As there was no agreement, Sonneborn set a September 29, 2021, deadline for post-hearing briefs. On September 27, 2021, the Board's counsel asked Sonneborn for a nine-day extension of the deadline to October 8, 2021. The Board's counsel stated that he was "limited by other hearings, briefs and other matters" and that his dog had a recent medical emergency. Sonneborn allowed the extension, finding the Board presented good cause for the "modest" extension. The parties submitted post-hearing briefs to Sonneborn on October 8, 2021.

¶ 95                                    F. Hearing Officer Sonneborn's Findings

¶ 96 On November 7, 2021, Sonneborn issued his written findings, concluding that there was cause to terminate Billups. In addition to finding that Haney was more credible than Billups, Sonneborn made particularized findings as to each of the five areas discussed in our 2019 order.

¶ 97 With respect to differentiation, Sonneborn stated:

> "[T]he record made clear that differentiation involved designing individualized lesson plans that present challenges and opportunities for each student to learn in his or her most effective way. Math lessons and questions are designed based on what the assessment data from various resources shows for each student, and students are placed in small groups of similarly adept students to facilitate that learning process. Proper grouping cannot be made without carefully reviewing all of the information available to each faculty member. At Lovett, these reassessments were to be made each week based on hard data."

Sonneborn concluded that Billups did not properly differentiate because he failed to use weekly data to regroup students and design tailored lesson plans. Sonneborn found that the final rating given to Billups in this area was appropriate.

¶ 98 As to the issue of whether Billups sufficiently managed student behavior, Sonneborn found the evidence was "mixed, weighted neither in favor of or against" Billups. Although there was some evidence of disruptions and misbehavior, Sonneborn found insufficient evidence to justify Billups receiving a rating "lower than proficient" in the area of class discipline.

¶ 99 As to the third topic—how Billups should have coordinated his math classes with other subjects—Sonneborn similarly found the evidence was "mixed." Billups claimed to have collaborated with other teachers, although there was not supporting documentation or testimony by others. Sonneborn found there was not sufficient evidence to justify Billups receiving less than a "proficient" rating on the topic of collaboration with other subjects.

¶ 100 Regarding "high-level" questions, Sonneborn found they are questions "designed to push the learning boundaries for students who have mastered the basic level of learning in a given math class" and "segue the students' learning to the next level of difficulty and complexity." Sonneborn found that Billups was coached as to how to integrate high-level questions into his lessons, but that he had failed to do so. He noted that Billups complained he was not told how many high-level questions to ask. However, Sonneborn found that Billups would have known the number of appropriate high-level questions, had he "actively invest[ed] in the differentiation process" and examined the results of students' weekly assessments. Thus, Sonneborn found that the evidence supported the rating Billups received in this area.

¶ 101 Regarding the improvement in test scores, Sonneborn found that in CPS, "test scores are not considered" in determining whether a teacher successfully completes remediation. He noted

that although Billups argued that test scores should be considered, it was "beyond the portfolio of this hearing officer" to recommend changes to the remediation system. Sonneborn otherwise found that the improved test scores resulted from the schoolwide "differential approach" employed by Lovett's teachers and administrators. Sonneborn found no evidence that Billups had such an impact on improved test scores to "warrant changing his evaluation score on differentiation."

¶ 102　　　Sonneborn concluded that the Board met its burden to show that Billups failed to successfully complete his remediation, and thus recommended his termination.

¶ 103　　　Billups subsequently filed a written exception to Sonneborn's findings. Among other arguments, he claimed that Haney was not credible and that Sonneborn was biased. Billups also complained that Sonneborn unlawfully extended the due date for post-hearing briefs "without good cause or a mutual agreement." The Board also filed a supplemental post-hearing brief in support of upholding Billups' ratings from his final evaluation and his corresponding termination.

¶ 104　　　　　　　　　G. The Board's April 2022 Decision to Terminate Billups

¶ 105　　　On April 27, 2022, the Board issued a decision in which it adopted Sonneborn's recommendation to terminate Billups. In doing so, the Board accepted the vast majority of Sonneborn's findings, except that it found that Billups deserved the "basic" rating he received with regard to managing student behavior. The Board explicitly found Haney was more credible than Billups and otherwise rejected Billups' claims of bias.

¶ 106　　　　The Board's decision specifically addressed each of the five areas identified in our October 2019 remand order. First, regarding differentiation, the Board accepted Sonneborn's definition: "a method of teaching centered on the individual student, an assessment of the student's understanding of the materials presented, areas needing improvement, and readiness to advance to

more difficult concepts." The Board found that, to differentiate, a teacher must review student test scores to design individualized lesson plans.

¶ 107       The Board found that Billups failed to differentiate, in that he failed to review weekly data to develop lesson plans. It noted that Billups failed to explain to Haney how he assessed students, how he placed them in groups, and how often he reassessed the groups. The Board also found that Williams was "constantly reminding" Billups to differentiate, but she rarely saw the regrouping of students that would be expected if he were differentiating. The Board found that his rating of unsatisfactory in differentiation was appropriate.

¶ 108       As to the second area identified by this court's prior order—managing student behavior— the Board determined that hearing officer Sonneborn "wrongly found that Billups was proficient in managing student behavior" and instead determined that Billups "should have received a basic rating." The Board explained that a "proficient teacher consistently refers to and enforces classroom rules", frequently checks on all students, and consistently responds to misbehavior. In contrast, a basic teacher "sometimes attempts to redirect student misbehavior but is not consistent with all students." The Board noted that during the final observation, Haney "estimated eight to ten students were off task" and "Billups did not address this misbehavior." The Board noted that Haney testified that "it was possible Billups asked one student to come up to the board to redirect his attention." Based on this evidence, the Board found Billups should have received a basic rating in this area.

¶ 109       Regarding the topic of coordinating his math classes with other subjects, the Board found that Billups' testimony "supports [Sonneborn's] finding that Billups did collaborate with three other teachers to create lesson plans," notwithstanding Billups' failure to upload those lesson plans

into the RLS system. The Board accepted Sonneborn's finding on this area and thus determined that Billups deserved a proficient rating for collaboration with other subjects.

¶ 110    Regarding high-level questions, the Board determined that they are questions that "challenge the more advanced students who have mastered basic concepts, keep them interested and attentive and provide scaffolding for them to advance to the next level of mathematical difficulty." It credited Haney's testimony that high-level questions require students to analyze and develop problem-solving skills. The Board found that Billups failed to comply with Haney's direction to script high-level questions in advance, noting Billups's admission he did not write any down before his final observation. It also credited Haney's testimony that Billups did not use high-level questions during the final observation.

¶ 111    Regarding the significance of test scores, the Board found that Sonneborn "correctly concluded that test scores are not considered" to assess whether a teacher successfully completed remediation.  The Board otherwise found that the improvement in Lovett's test scores was "school-wide and resulted from five years of effort" by principal Haney, teachers and staff "to individualize and enrich the students' education experience." Further, the Board found that Williams' testimony indicated that Billups complied with the school's differentiation program for "two months at most." Thus, Billups could not be credited for a substantial impact on test scores.

¶ 112    The Board elsewhere accepted Sonneborn's finding that Haney was credible, rejecting Billups' contention that Haney was biased against him. The Board also found that Sonneborn was impartial. The Board concluded that Billups did not successfully complete remediation and adopted Sonneborn's recommendation to terminate his employment. On April 27, 2022, the Board issued a corresponding resolution terminating Billups.

¶ 113    On May 24, 2022, Billups filed with our court a timely petition seeking direct review of the Board's decision, such that we have appellate jurisdiction pursuant to Supreme Court Rule 335. Ill. S. Ct. R. 335 (eff. July 1, 2017). The parties' briefs were filed and the case became ready for review on October 3, 2022.

¶ 114                                II. ANALYSIS

¶ 115    On appeal, Billups challenges the Board's termination decision by attacking the sufficiency of the proof, as well as the conduct of hearing officer Sonneborn. Billups primarily contends that the Board failed to meet its burden to establish cause for his termination, raising a number of factual contentions directed to each of the five areas specified in our October 2019 order.

¶ 116    Apart from his evidence-based arguments, Billups criticizes hearing officer Sonneborn. He claims Sonneborn was not disinterested and impartial, suggesting Sonneborn had a financial interest in the result of the proceeding. Separately, he contends that Sonneborn erred when he granted the Board a nine-day extension of time to file its post-hearing brief and when he permitted Murphy to testify as an expert witness. Billups also suggests that the Board's timing in issuing its decision violated his rights. For the reasons that follow, we find these contentions are without merit. Thus, we affirm the decision of the Board and uphold Billups' termination.

¶ 117                           A. Standard of Review

¶ 118    Section 34-85(a)(8) of the School Code provides that a dismissed teacher may seek judicial review of the Board's decision. 105 ILCS 5/34-85(a)(8) (West 2022). This review is initiated in the First District of the Illinois Appellate Court and is governed by the Administrative Review Law (735 ILCS 5/3-101 *et seq*). *Id.*

¶ 119    "In administrative review cases, we do not review the decision of the hearing officer; rather, we review the decision of the Board. [Citations.]" *Crawley v. Board of Education of City of*

*Chicago,* 2019 IL App (1st) 181367, ¶ 12. "The findings and conclusions of the Board on questions of fact are held to be *prima facie* true and correct, and no new or additional evidence on the point at issue may be considered. [Citation.]" *Id.*, ¶ 17. An agency's findings of fact "are not to be reweighed by a reviewing court and are to be reversed only if they are against the manifest weight of the evidence." *Beggs v. Board of Education of Murphysboro Community Unit School District No. 186*, 2016 IL 120236, ¶ 50.

¶ 120    A tenured Chicago public school teacher cannot be fired except "for cause." *Crawley*, 2019 IL App (1st) 181367, ¶ 13 (quoting 105 ILCS 5/34-85(a) (West 2016)). "Cause" is not defined by statute, but this court has defined it as "that which law and public policy deem as some substantial shortcoming which renders a teacher's continued employment detrimental to discipline and effectiveness or something which the law and sound public opinion recognize as a good reason for the teacher to no longer occupy his position." (Internal quotation marks and citations omitted.) *James v. Board of Education of City of Chicago*, 2015 IL App (1st) 141481, ¶ 16.

¶ 121    Whether there was sufficient "cause" is a question of fact, reviewed under the manifest weight of the evidence standard. *Id.* That is, "we will not disturb the board's finding of cause unless an opposite conclusion is clearly evident from the record. [Citation.]" *Id.* Under this standard, we will not reverse "simply because the opposite conclusion is reasonable or because we might have ruled differently." *Raitzik v. Board of Education of City of Chicago*, 356 Ill. App. 3d 813, 823-24 (2005).

¶ 122    We recognize that this appeal has a relatively limited scope, given the issues identified for remand in our 2019 order upon Billups' prior appeal. *Billups*, 2019 IL App (1st) 180463-U. In our prior order, we specifically remanded "for further proceedings as to the absent factual determinations" concerning five specific topics. *Id.*, ¶ 96. Thus, our review is limited to whether

the Board complied with that direction. See *Norris v. National Union Fire Ins. Co. of Pittsburgh*, 368 Ill. App. 3d 576, 581 (2006) ("When an appellate court reverses and remands the cause with a specific mandate, the only proper issue on a second appeal is whether the trial court's order is in accord with the mandate.").

¶ 123　　B. The Board's Findings Regarding Differentiation Were Not Against the Manifest Weight of The Evidence

¶ 124　　We first address Billups' contentions that the Board did not show by a preponderance of the evidence that he failed to successfully complete remediation.[5] Billups references each of the five specific areas delineated in our 2019 order and suggests that the evidence on those topics did not support termination. In doing so, he attacks Haney's credibility and essentially suggests that this court should reweigh the evidence. Keeping in mind the deferential standard of review, we reject his contentions.

¶ 125　　On the topic of differentiation, Billups does not dispute the accuracy of the definition adopted by the Board. Rather, he contends that the administration at Lovett and principal Haney never provided him with a "clear and concise illustration or definition of differentiation." He also claims that Haney provided inconsistent testimony at the 2017 and 2021 hearings as to whether Billups had opportunities to observe other teachers to model the type of differentiation that Haney expected. Billups suggests that Haney changed his testimony to add details at the latter hearing in order to "coverup all of his missteps." He claims that Haney's answers call into question Haney's "credibility" and "truthfulness."

---

[5] We note that Billups' *pro se* briefing sometimes erroneously suggests that hearing officer Sonneborn's factual findings are at issue in this appeal. As the Board points out, our role is to review the findings and decision of the Board, not the hearing officer.

¶ 126    Billups also attacks Haney's testimony that professional development resources were available to Billups regarding differentiation. Billups claims there was no corroborating evidence of such resources. Likewise, Billups criticizes Haney's testimony as too vague as to what Haney specifically provided or recommended to Billups to help him implement differentiation.

¶ 127    Billups otherwise claims that Haney's evaluation of him was subjective and biased. He suggests that Haney's evaluation is undermined by the positive comments in Williams' consulting logs, as well as Williams' testimony that she saw some differentiation, namely students working in groups. Billups also refers us to his own testimony about his efforts to differentiate, including placing students into groups and assigning different questions to different students. Billups also attacks the remediation plan as "sketchy" and contends that it offered insufficient explanation how he should implement differentiation. Further, Billups maintains that he never received a written copy of the remediation plan, which "brings into question Principal Haney's credibility." Billups suggests that, given Haney's "lack of credibility," combined with own and Williams' testimony, the Board did not prove that Billups "did not differentiate his lessons."

¶ 128    These contentions essentially ask us to reweigh the evidence, which we cannot do. *Beggs*, 2016 IL 120236, ¶ 50. The Board found that Billups did not use recommended tools to implement differentiation. That finding was supported by Haney's and Williams' testimony, which the Board was entitled to credit. We reiterate that it is not our role to reweigh the evidence or make new factual determinations. *Crawley*, 2019 IL App (1st) 181367, ¶17. The Board found Haney credible and supported his rating of Billups as unsatisfactory with respect to differentiation, based on Billups' failure to follow the remediation plan[6]. We simply will not substitute our judgment on

_____

[6]We note that although Billups maintains that he never received the written remediation plan, that factual question is not within the scope of our prior order's directions for remand. Further, our prior order already discussed this claim and determined that we "cannot reweigh the conflicting testimony of Haney

credibility determinations. Further, even considering Williams' testimony and logs, we cannot say the Board's findings on differentiation were against the manifest weight of the evidence. We note it is undisputed that Williams, as consulting teacher, did *not* participate in the final evaluation. Thus, she could not and did not contradict any of Haney's specific observations during that evaluation. Moreover, Williams' logs and testimony reflect that she shared Haney's concerns about the lack of differentiation. Although she testified that Billups placed students into groups, she did not know whether Billups used the recommended tools, such as Descartes, to properly form those groups. Her testimony otherwise supported the Board's finding that "the consulting teacher [Williams] did not see Billups use the recommended assessments to designate groups, prepare lesson plans, or pose high-level questions." We thus decline to disturb the Board's findings on the topic of differentiation.

¶ 129      C. The Board's Finding That Billups Deserved a "Basic" Rating for "Managing Student Behavior" Was Not Against the Manifest Weight of the Evidence

¶ 130      We turn to Billups' contention regarding the second topic identified by our prior order, which sought findings as to whether Billups' ability to discipline his students supported the rating he received for managing student behavior. *Billups,* 2019 IL App (1st) 180463-U, ¶ 92. Notably, whereas Haney evaluated him "unsatisfactory" in this regard, the Board's decision on remand found that Billups deserved "a basic rating on managing student behavior", *i.e.,* one rating better. Nonetheless, Billups makes a number of factual assertions to argue that he deserved an even higher

---

and Billups to conclude that Billups did not properly receive his remediation plan." *Billups,* 2019 IL App (1st) 180463-U, ¶ 80. In any event, the evidence in the record—including a copy of the remediation plan reflecting Billups's signature on December 4, 2015—supported the Board's finding that he was, in fact, apprised of it.

rating. However, as we do not reweigh evidence or consider evidence outside the record, his claim fails.

¶ 131       Citing his own testimony and noting his "25 years of classroom experience," Billups describes the positive classroom atmosphere and "respectful rapport" that he had with his students. He notes that Williams' logs contained positive comments about the learning environment and his respectful interactions with students. He claims that Williams' observations were "totally opposite" to Haney's description of his class.

¶ 132       Billups also emphasizes that the Board did not present any evidence of "write ups," incident reports, or complaints regarding classroom discipline. He also claims (citing his own testimony from the 2017 hearing) that Haney never raised concerns about student behavior with him. He asserts a "preponderance of evidence " indicates he was "capable of managing student behavior." He thus suggests the Board erred when it determined that a "basic" rating was warranted, rather than accept Sonneborn's recommendation that he receive a "proficient" rating in this area.

¶ 133       Billups's contentions on this point are unavailing, as they do not demonstrate that the Board's decision on this point was against the manifest weight of the evidence. Billups largely relies on assertions about his 25-year teaching history that cannot be verified in the record. Importantly, Billups' contentions do not dispute the evidence relied on by the Board to arrive at its decision that a "basic" rating was appropriate. The Board correctly observed that the CPS Framework for Teaching sets forth attributes of a teacher deserving of an "unsatisfactory", "basic" or "proficient" rating on the component of "Managing Student Behavior." As noted by the Board, the CPS framework indicates that "an unsatisfactory teacher engages in little or no monitoring" and fails to respond to misbehavior, a "basic" rating reflects a teacher who "sometimes attempts to redirect student misbehavior" but is not consistent with all students, and a "proficient" rating

reflects a teacher who frequently checks on all students and consistently responds to misbehavior and enforces classroom rules. The Board's decision reflects that it applied this rating criteria to Haney's observation that several students were "off task" during the final classroom observation, as well as Haney's acknowledgement that Billups may have redirected one of those students. The Board's finding that Billups deserved a "basic" rating on this component was thus supported by evidence in the record. Thus, it was not against the manifest weight of the evidence.[7]

¶ 134                    D. The Board's Findings Regarding Collaboration With Other Classes

¶ 135        We turn to the third topic for remand identified in our prior order, which called for "findings as to how Billups should have combined other classes' subject matter with middle school math." *Id.*, ¶ 93. Notably, the Board's April 2022 decision was favorable to Billups on this topic. The Board specifically found that "Billups deserved a proficient rating for collaborating because he worked with three other teachers to create lesson plans," accepting Billups' testimony on that point. Thus, it is clear that the Board did not rely on any findings on this topic in its ultimate determination that there was cause for Billups' termination.

¶ 136        Nonetheless, Billups' opening brief sets forth a number of factual contentions related to his efforts to incorporate other subjects into his classes. Among these, he asserts that Haney did not give him "meaningful feedback" as to how he should incorporate other subjects, and that Haney was unjustified in giving him an unsatisfactory rating for the "Designing Coherent Instruction" component. He otherwise attacks Haney's truthfulness, even suggesting that certain written evidence offered by Billups was "erased" and "replaced by Principal Haney's scripted comments."

---

[7] We recognize there was no evidence of egregious student misbehavior in Billups' classroom. We have no reason to doubt Billups' claims that he generally maintained a positive rapport with students over the course of his career, or that he never received complaints about inappropriate classroom behavior. However, even if true, these claims do not address the relevant question on appeal—whether there was evidence to support the Board's decision.

¶ 137    Since the Board found *in favor* of Billups with respect to coordination with other subjects, it is unclear why Billups makes these contentions. Billups does not suggest that the Board's findings on this specific topic undermine its ultimate determination that Billups did not successfully complete remediation. And to the extent Billups attacks Haney's credibility, we reiterate that it is not our role to substitute our judgment for that of the Board. See *Cinkus v. Village of Stickney Municipal Officers Electoral Bd.,* 228 Ill. 2d 200, 210 (2008) ("In examining an administrative agency's factual findings, a reviewing court does not weigh the evidence or substitute its judgment for that of the agency.") In short, none of Billups' contentions on this topic offer a legitimate reason to disturb the findings of the Board.

¶ 138    E. The Board's Findings Regarding High-Level Questioning Were Not Against the Manifest Weight of the Evidence

¶ 139    The fourth topic identified in our remand order called for the Board to make findings related to the meaning of a "high-level" question and "whether Billups failed to provide the appropriate amount of 'low' and 'high-level' questions so as to contribute to his lower ratings in remediation." *Billups*, 2019 IL App 180463-U, ¶ 94.

¶ 140    In the portion of his brief pertaining to this issue, Billups does not dispute the Board's findings as to what constitutes a high-level question. Instead, he makes a number of factual assertions suggesting he did not deserve the low rating he received on this subject. Among these, he criticizes Haney and Lovett's administration for failing to provide specific recommendations, failing to demonstrate appropriate questioning techniques, and failing to inform him of "the number of high vs low ended questions" he should ask.

¶ 141    Billups also asserts that, contrary to Haney's testimony, he did in fact script four high-level questions prior to the final observation in May 2016. Billups otherwise points to portions of

Williams' written logs and testimony, as well as his own testimony and "years of experience teaching middle school mathematics", as evidence that he used high-level questioning. Billups further suggests that his students' standardized test scores "proves his questioning was appropriate."

¶ 142      Once again, Billups' claims fail to demonstrate that the Board's conclusions were against the manifest weight of the evidence. Notably, the Board specifically found (and Billups does not dispute) that "Billups knew how to formulate high level questions in math."[8] However, the Board's decision credited Haney's final observation and related testimony that (1) Billups ignored Haney's direction to script high-level questions in advance and (2) that Billups did not ask high-level questions during the final classroom observation. The Board was entitled to find Haney credible. Further, Billups admitted on cross examination at the 2021 hearing that he did not write out high-level questions before the final evaluation. Moreover, nothing in Williams' logs or testimony directly conflicts with Haney's testimony that Billups did not use high-level questions. Further, we reject Billups' unsupported suggestion that improved standardized test scores compel the conclusion that he used appropriate questions. In short, none of Billups' contentions show that the Board's findings with respect to high-level questions were against the manifest weight of the evidence. Thus, we will not disturb those findings.

¶ 143                F. Student Test Scores Did Not Affect Billups' Evaluation

¶ 144      The final topic for which our October 2019 order sought findings on remand was why Billups' performance as a teacher was deemed unsatisfactory, despite the evidence that Lovett

---

[8] Billups' brief contains somewhat contradictory contentions on this point. On the one hand, he complains that Haney did not provide adequate guidance to formulate high-level questions, yet elsewhere he asserts that his "understanding of pedagogy and years of experience" allowed him to "provide developmentally appropriate questioning for his students." In any event, the Board was entitled to find that Billups was capable of formulating high-level questions, but that he did not adequately use them.

students' standardized test scores improved dramatically. *Id.*, ¶ 95. On this point, the Board found that hearing officer Sonneborn "correctly concluded that test scores are not considered to determine whether a teacher successfully completed remediation because they are the result of a variety of factors" beyond a teacher's performance. That finding was supported by Amanda Smith's and Haney's uncontradicted testimony that test scores do not affect a CPS teacher's evaluation. Further, Billups acknowledged on cross-examination that "student growth" is not a rating criteria, although he said "it should be."

¶ 145    On appeal, Billups "recognizes that test scores are not a component of an evaluation for educators under remediation" but urges that "test scores should be considered" in assessing whether a teacher successfully completes remediation. Thus, Billups states he "is appealing to the courts to weigh the significance of his students' growth when determining his value and abilities as an educator." Billups argues at length as to why he should have received credit for improved test scores, challenging the findings of Sonneborn and the Board that his performance did not have a significant impact on those scores.

¶ 146    Billups' acknowledgment that test scores are *not* one of the criteria for determining a successful remediation renders his remaining arguments unavailing. It is not this court's role to decide the wisdom of the CPS's rating criteria. To the extent that Billups urges that test scores *should* be considered, his request is more appropriately directed to the legislature for amendment of the School Code. See 105 ILCS 5/34-85 (West 2022) (setting forth procedures for removal for cause); see also 105 ILCS 5/24A-5 (West 2022) (specifying certain requirements for teacher evaluation plans, except for those teachers in "schools identified in an agreement entered into between the board of a school district operating under Article 34 of this Code [governing cities of over 500,000 inhabitants] and the exclusive representative of the district's teachers."). Further, we

recognize that the specific criteria for CPS teacher evaluations are governed by the collective bargaining agreement between the Board and the Chicago Teachers Union. See *Gibson v. Chief Executive Officer of Board of Education of City of Chicago*, 2019 IL App (1st) 180673-U, ¶ 5 ("[p]ursuant to a collective bargaining agreement *** Chicago teachers are evaluated using the Chicago Public School (CPS) Framework for Teaching, which measures teacher performance in 19 aspects of teaching (called components) that are grouped into four domains."). It is not this court's role to decide, as a policy matter, whether student test scores should factor into a teacher's evaluation, nor is it our role to interfere with the governing collective bargaining agreement. Thus, Billups' argument that test scores should have been considered is not a reason for us to conclude that the Board erred in determining that, under the governing CPS criteria, he did not successfully complete remediation.[9]

¶ 147    For the above reasons, we reject Billups' arguments, insofar as they challenge the Board's findings concerning the five areas identified in our October 2019 order. We turn to Billups' remaining contentions.

¶ 148            G. Billups' Allegation of Bias Against Hearing Officer Sonneborn Is Unfounded

¶ 149    Apart from his challenges to the Board's substantive findings, Billups makes certain claims regarding hearing officer Sonneborn. First, Billups contends that Sonneborn was not disinterested or impartial. He claims this bias is evidenced by his decision to conduct a new hearing after the parties "agreed to forgo a new hearing," asserting that Sonneborn "st[oo]d to benefit financially"

---

[9] Since standardized test scores do not affect a CPS teacher's evaluation, there was no reason for the Board to make a finding that Billups' teaching "did not significantly impact" test scores. However, the Board's inclusion of that irrelevant finding does not give us any reason to disturb the Board's remaining findings.

by holding another hearing. He further claims that Sonneborn "had a financial and personal interest to rule for the Chicago Board of Education, if he wanted to be selected to review more cases."

¶ 150    Due process principles apply to administrative hearings, and the parties have the right to a fair and impartial tribunal. *Girot v. Keith*, 212 Ill. 2d 372, 380 (2004). However, there is a presumption that agency administrators and hearing officers act with integrity. *Scott v. Department of Commerce & Community Affairs*, 84 Ill. 2d 42, 55 (1981) ("[W]ithout a showing to the contrary, State administrators are assumed to be men of conscience and intellectual discipline, capable of judging a particular controversy fairly on the basis of its own circumstances." (Internal quotation marks omitted.)). More than the "mere possibility of bias" is required to show that an administrative proceeding was unfair. *Grissom v. Board of Education of Buckley-Loda Community School District No. 8*, 75 Ill. 2d 314, 321 (1979).

¶ 151    Here, Billups offers nothing beyond speculation for his claim of bias. Insofar as he claims that Sonneborn betrayed the parties' agreement to forgo an additional hearing, the record reflects that the parties specifically agreed that Sonneborn could direct a new hearing, if he determined it was necessary to make the factual findings called for by our October 2019 order. Further, our prior order specifically remanded "for a fact finding hearing." *Billups*, 2019 IL App (1st) 180463-U, ¶ 2. Thus, Sonneborn's decision to hold a new hearing does not undermine the presumption of impartiality. Billups otherwise speculates that Sonneborn was biased because "hearing officers understand that the more you rule in favor of the Board the less likely you are to be stricken from the [Board's] list of hearing officers." Such conclusory assumptions do not amount to a showing of bias to overcome the presumption that Sonneborn acted fairly and honestly.

¶ 152    H. Hearing Officer Sonneborn Did Not Err by Granting a Nine-Day Briefing Extension

¶ 153        Billups otherwise suggests that Sonneborn erred when he granted the Board's request for a nine-day extension of time to submit its post-hearing brief, because there was no "good cause" for the extension and because Billups did not agree to it. See 105 ILCS 5/24-12(d)(6) (West 2020) ("Any post-hearing briefs must be submitted by the parties by no later than 21 days after a party's receipt of the transcript of the hearing, unless extended by the hearing officer for good cause or by mutual agreement of the parties.") The record reflects that Sonneborn initially set a due date of September 29, 2021, which was 21 days after Billups received the hearing transcripts on September 8, 2021.[10] On September 27, the Board's counsel requested a nine-day extension to October 8, 2021. Sonneborn allowed that extension, finding the Board "presented good cause for a short extension of time", noting the Board's counsel explained that he had conflicting deadlines and hearings in other matters, and that the request was for a "modest 9-day extension."

¶ 154        Billups' claim of error on this point is without merit. "Good cause" is not defined by the applicable statute, and Billups does not cite any authority to suggest that the hearing officer could not find "good cause" based on counsel's scheduling conflict. As the Board points out, Billups cites to a provision of the Administrative Code that defines "good cause" for deviation from the timing of the hearing, which ordinarily must commence "within 75 days and conclude within 120 days after the appointment of the hearing officer." 23 Ill. Adm. Code 51.60(c)(9) (eff. July 25, 2012). That provision defines "good cause" for that specific subsection to mean "the illness or otherwise unavoidable emergency of the teacher, district representative, their legal representatives, the hearing officer, or an essential witness." *Id.* However, the same section of the Administrative

---

[10] Billups claims that the Board's counsel and Sonneborn engaged in "deception" because they received copies of the hearing transcripts weeks earlier, yet Billups did not learn the transcripts were available until he contacted the court reporting company on September 8, 2021. Billups' allegations of "deception" are rebutted by the record, which makes clear he was on notice that it was his responsibility to contact the court reporter to order his own copy of the hearing transcripts.

Code does not purport to limit what is "good cause" that can support extension of the due date for post-hearing briefs. See 23 Ill. Adm. Code 51.60(c)(14) (eff. July 25, 2012) ("At the close of the hearing, the hearing officer shall direct the parties to submit post-hearing briefs no later than 21 days after receipt of the transcript, unless extended by the hearing officer for good cause or by mutual agreement of the parties."). Thus, the relevant provisions of the School Code and Administrative Code make clear that the hearing officer has discretion to decide if there is "good cause" to allow an extension of the briefing deadline. Billups has not articulated why Sonneborn's granting of the Board's requested extension amounted to an abuse of discretion. In any event, Billups has not suggested how his rights were adversely affected by the extension, as would be necessary to warrant reversal on this basis. See 735 ILCS 5/3-111(b) (West 2022) ("Technical errors in the proceeding before the administrative agency *** shall not constitute grounds for the reversal of the administrative decision unless it appears to the court that such error or failure materially affected the rights of any party and resulted in substantial injustice to him or her.").

¶ 155      I. Hearing Officer Sonneborn Did Not Err in Admitting Murphy's Expert Testimony

¶ 156      Elsewhere, Billups suggests that Sonneborn erred in permitting the Board to elicit Anika Murphy's testimony as an expert witness in mathematics instruction. Billups claims Murphy was not qualified, noting she had never written a remediation plan, had never evaluated a teacher, was not familiar with Billups or his students, and had "limited experience as a school administrator." He states that although Murphy "used math in her previous employment, she has limited teaching experience in elementary and middle school education, particularly in math." He claims she was "nothing more than a rubber stamp for the Board and not an objective witness."

¶ 157      "We review an administrative agency's decision regarding the admission of evidence for an abuse of discretion. [Citation.]" *Danigeles v. Illinois Dep't of Financial and Professional*

*Regulation*, 2015 IL App (1st) 142622, ¶ 82. An abuse of discretion means a decision that is "arbitrary, fanciful, or unreasonable to the degree that no reasonable person would agree with it." *People v. Lerma*, 2016 IL 118496, ¶ 23 (discussing trial court's discretion to admit expert witness testimony). Moreover, "[a]n evidentiary ruling, even if incorrect, will not be reversed unless there is demonstrable prejudice to the complaining party." (Internal quotation marks omitted.) *Danigeles,* 2015 IL App (1st) 142622, ¶ 82.

¶ 158       Given the testimony in the record, we cannot say it was unreasonable for the hearing officer to permit Murphy to testify as an expert in mathematics instruction. Murphy was thoroughly questioned about her background and qualifications. She had 11 years of experience in CPS, including as a math teacher before she became an "instructional support leader" (ISL). As an ISL, she worked with math teachers from kindergarten through 12th grade. She testified that she had six endorsements to her teaching license, including 6th through 8th grade mathematics and secondary education. She also testified to her familiarity with the CPS evaluation framework, through having been evaluated herself and by supporting teachers as an ISL. In that role, she provided coaching to teachers subject to remediation plans. Given this testimony, the hearing officer could reasonably conclude that Murphy was qualified to testify as an expert in mathematics instruction. We thus reject Billups' claim that the admission of her testimony constituted error.

¶ 159              J. The Timing of the Proceedings on Remand Does Not Warrant Reversal

¶ 160       Finally, Billups contends that the timing of the Board's April 2022 decision violated his rights and the School Code. He points out that the Board's April 2022 decision was issued more than five months after Sonneborn's November 2021 Findings and Recommendation, and that it came approximately two and a half years after this court ordered remand in October 2019. He

asserts the length of this process is an indicator of how the Board "violates teachers' rights and how little they think of teachers."

¶ 161       Although Billups generally asserts that the timing of the Board's actions violated his rights, the only authority he cites is section 34-85 of the School Code, which states:

> "The board, within 45 days of receipt of the hearing officer's findings of fact and recommendation, shall make a decision as to whether the teacher or principal shall be dismissed from its employ. The failure of the board to strictly adhere to the timeliness contained herein shall not render it without jurisdiction to dismiss the teacher or principal." 105 ILCS 5/34-85(a)(7) (West 2022).

¶ 162       Billups' claims regarding the timeliness of the Board's action do not undermine the validity of the Board's decision. He offers no authority suggesting that the mere delay in issuance of the Board's decision is grounds for reversal. Indeed, the very statute he relies on makes clear that the Board's failure to make a decision within 45 days after the hearing officer's recommendation "shall not render it without jurisdiction to dismiss the teacher." *Id.*

¶ 163       Moreover, Billups has not articulated any way in which the timing of the Board decision actually prejudiced his rights, so as to warrant reversal. We again note that "technical errors in the proceeding before the administrative agency *** shall not constitute grounds for the reversal of the administrative decision unless it appears to the court that such error or failure materially affected the rights of any party and resulted in substantial injustice to him or her." 735 ILCS 5/3-111(b) (West 2022).

¶ 164       Finally, Billups offers no authority to suggest that the approximately two-and-a-half year period between our October 2019 order and the Board's April 2022 decision is grounds for

reversal. In any event, we note that this time period encompassed the onset of the COVID-19 pandemic, which undoubtedly delayed proceedings.

¶ 165    In summary, Billups offers no reason for us to conclude that the Board's findings on remand were against the manifest weight of the evidence. His remaining procedural claims are without merit.

¶ 166                                   CONCLUSION

¶ 167    For the foregoing reasons, we affirm the decision of the Board finding that Billups failed to successfully complete remediation and dismissing him from employment.

¶ 168    Affirmed.